## In the Matter of CARTER PERKINS and ROBERT PERKINS.

### HABEAS CORPUS.

By the Act of April 20, 1852, the power of hearing and determining writs of habeas corpus is vested in the Judge of every Court of record in the State. The final determination is not that of a Court, but the simple order of a Judge, and is not appealable from or subject to review.

The doctrine of res adjudicata does not apply to such determination.

Under the statute, judgment upon one writ is no bar to further proceeding upon another. Any person may pursue the remedy till he has exhausted the judicial power of the State.

Qu. If the *whole* power to legislate on the subject of "fugitives from labour," is vested in Congress?

The States have *police* power in virtue of their general sovereignty, which never was conceded to the United States, and this extends over all subjects within their limits.

By virtue of their police power, the States possess jurisdiction to arrest and restrain fugitive slaves, and to remove them from their borders, but not so as to *obstruct* the owner in reclaiming his slave under the Constitution of the United States.

In aiding the owner in the reclamation of his slave, the State acts in virtue of its territorial jurisdiction over the subject.

The exercise of like powers by the States has been acquiesced in for years, as in cases of "fugitives from *justice*," in the authentication of records, &c., in which the powers exercised by the United States and the States are concurrent.

The States may *enforce* the constitutional right, but may not impair it.

Where the constitutional *prohibition* is confined to the passing of laws injurious to the right, the power to *enforce* it is implied.

The State has, under its police powers, the right to relieve itself of any obnoxious class of population; and this has never been denied.

The judgment upon a writ of habeas corpus does not determine the question of the claim of the prisoners to freedom. It leaves that to future adjudication.

The intention of the 4th section of the act, was simply to place the persons to whom it relates in the category of fugitives from labour, extending the provisions of the law over them; but to change their actual *status*, was a power alike beyond the power and intention of the Legislature.

If the laws of Mexico remained in force till changed by the Legislature, yet slavery is a political institution, and the political laws of the ceded or conquered country give way to those of the acquiring country.

If the Constitution of the State does abolish slavery, and affirm the Mexican law, and if she have the power to control her own internal police as fully before as after her recognition by the other States, yet it does not follow that upon her admission into the Union, she will have any authority to impair the obligation of rights subsisting under the federal Constitution.

If the slaveholder had authority to bring his slaves here under the Constitution of the United Staies, the right could not be abridged or controlled until the admission of California as an independent State by Congress.

The Act of 15 April, 1852, is not an *ex post facto* law. It impairs no right, nor does it constitute the refusal to return to servitude a crime ; it simply provides for the departure of slaves brought here before a certain period.

Nor does it impair the obligation of contracts. The State has entered into no contract with free negroes, fugitives or slaves, by providing by her Constitution, that slavery or involuntary servitude ·shall not exist within her limits, which would prevent her, on proper occasion, from removing them.

Nor does the act impair the constitutional right of trial by jury. The *rights* of the slave are not determined by the arrest and commitment, nor by the examination on the writ of habeas corpus. The right to trial by jury is secured in all cases involving questions of liberty, property or punishment.

The State in the exercise of her police power, may expel from her limits slaves brought here voluntarily by their owners before the State was admitted into the Union.

Quere, Whether a slave becomes *ipso facto* free by his owner taking him voluntarily into a free State; and whether the master's control does not cease for the want of positive law authorizing its exercise ?

The Constitution of the United States recognizes a property in this class of persons, and the institution is a social and political one.

The owner of slaves in Mississippi brought them voluntarily into California before the adoption of the Constitution by the State. The slaves asserted their freedom, and for some months were engaged in business for themselves. Afterwards the Act of 15 April, 1852, was passed by the Legislature, the 4th section of which in substance enacts, that slaves who had been voluntarily introduced into the State before the adoption of the Constitution, and who refused, upon the demand of their owner, to return to the State where they owed labour, &c., should be deemed to be fugitives from labour; and gave the owner the same remedies for their reclamation as are provided for the recovery of such fugitives. The owner, under the provisions of the above Act, brought them before a Justice of Peace who allowed the claim of the owner, and ordered them into his custody. The slaves then petitioned for this writ of habeas corpus, which came before the Supreme Court; and after hearing the case, the Court ordered that the writ be dismissed, and the slaves remanded to their owner.

THIS case was brought before Judge Wells, of the Supreme Court, by the petition and affidavit of the prisoners, Robert and Carter Perkins and Sandy Jones, July 1st, 1852, which sets forth, that about the 1st of June, 1852, they were seized without process of law, and taken before B. D. Fry, a justice of the peace of Sacramento, upon a pretended claim of one C. S. Perkins, of the State of Mississippi, for a certificate to remove them from the State of California to Mississippi, under the act of California, respecting fugitives from labour, and slaves brought into this State prior to her admission into the Union, passed April 15th, 1852.

And further states, that Fry granted the certificate, and they are advised that the said act is wholly unconstitutional and void, and that the said justice had no jurisdiction, &c.

And each for himself says, that he is not a fugitive from labour, and owes no service to the said Perkins; but that they were brought into this State prior to its admission into the Union, by the said Perkins, and that they have ever since here resided; and that for several months prior to their arrest, had been engaged in business for themselves.

That they are now held in confinement, &c., under the said certificate, upon the claim of the said Perkins, and under the said act of the legislature. And pray for a writ of certiorari to the justice, to certify the proceedings to the Supreme Court, returnable, &c.

The petition of *Moses Jackson*, in behalf of the prisoners, was also presented, and a writ of habeas corpus ordered, returnable before the Supreme Court, at the July term, 1852, at the opening of the Court.

The sheriff made return, and produced the prisoners in Court; and Harden Scoles answered to the writ, and said that he held the prisoners, as agent of. C. S. Perkins, by virtue of the certificate of Justice Fry, issued under the 4th section of the act, "entitled an act respecting fugitives from labour, and slaves brought into this State prior to her admission into the Union." The said prisoners having been introduced into this State previous to her admission into the United States, and they having been held to service in the State of Mississippi by the laws thereof, by C. S. Perkins. The answer also states, that the said Robert and

Sandy had been taken before Judge Aldrich, of the Sixth Judicial District, by habeas corpus, who remanded them to the possession of the respondents, June 11th, 1852.   And shows his authority as agent of the said C. S. Perkins, and the proceedings before the justice and the district judge.

*Norris* and *Brown*, for petitioners.

The state of slavery is a municipal regulation, founded upon and limited by the range of territorial laws; Prigg *v.* Commonwealth of Pennsylvania, 16 Peters, 539; Martin's Reports, 402; Story's Conflict of Laws, 92, 97; 3 D. & Ryl. 679; 3 Marshall, 470.

Slavery was abolished throughout the Mexican Republic by a decree of the congress, passed 1829, and was not known as existing in this State at the time of the conquest.   Sa Arrillaga Recupilacion de Lyes Euero dicimba de 1829, page 213.

The laws and municipal regulations in force at the time of the conquest or cession, remain in force until changed by the new sovereign; Kent's Com. 178; Collins's case, 7 Co. 17; Campbell *v.* Hale, Cowp. 209; 9 Peters, 711. 734. 748–9; Steather *v.* Lucas, 12 Pit. 410. 436.

We adopted the laws of Mexico and their tribunals—their prefects, alcaldes, &c., to expound them, till altered by express enactment; and by statute formally adopting the common law.

Our Constitution prohibits slavery and involuntary servitude, unless for the punishment of crimes.   And this only engrafted a principle long established by the Mexican law.

If it be urged that the Constitution was inoperative till after the admission of the State into the Union, then the answer is, that the Mexican law controlled up to that period.   But the sovereignty of the State was complete by the adoption of the constitution; this does not depend upon its recognition by other States.   The existence of a State *de facto*, is sufficient to establish its sovereignty *de jure*.   Wheaton's Elements of International Law, 56, 57; 1 Vattel.

If a slave is brought into a free State by his master, or by his consent, he becomes free, unless the State has provided for his temporary sojourn; and he cannot be called upon to return; 2

Kent's Com. 257, note; 18 Pickering, 270; 2 id. 270; 5 id. 144; 1 id. 725.

The statute is *ex post facto*, and violates the 10th section of the Constitution of the United States, art. 1; 7 Johns. Rep. 477; Large *v.* Wisner, 8 Wend. 661.

The power of legislation in relation to slavery, belongs exclusively to the national legislature. The States have no concurrent power; Sturges *v.* Crowningshield, 4 Wheaton, 122; Jack *v.* Morton, 12 Wend. 301; 14 id. 535; Prigg *v.* Commonwealth of Pennsylvania, 16 Pet. 542; id. 539; 1 Smith's Ind. 258; U. S. Laws, 1850, p. 462; 8 Georgia Rep. 216, 17. 223.

The exposition of the Constitution of the United States by the Supreme Court, is conclusive upon the State Courts; Bank of the United States *v.* Norton, 3 Marsh. 428; 8th Pick. 136; 6 Connecticut, 493; 5 Monroe, 294; 8 ib. 58.

The statute also violates the 3d section of Article I. of the State Constitution, which declares that the trial by jury shall be secured to all, and remain inviolate forever. 1 Dow. 231. Any law that conflicts with a constitutional provision, is not within the province of ordinary legislation. 3 Barb. S. C. R. 196. The doctrine *res adjudicata* has no application to a writ of habeas corpus. Certainly not in this State. People *v.* States, 6 John. Rep. 428; Com. *v.* McClosky, 2 Raw. 384; Ex parte Lawrence, 5 Binn. 304; Laws of 1850, p. 336, sect. 29; Laws of 1851, p. 29, sect. 132. The judgment of Judge Aldrick was not the judgment of a Court, and is not appealable from or subject to review. Laws of 1851, p. 104, sect. 336; Certiorari, Ib. 123, sect. 456.

Section 4 of the law of April 15th, being merely appurtenant to the 1st section, must fall with it; and is void for reasons applicable to itself. In saying what is beyond the power of legislation—that a thing shall be deemed to be, which it is impossible to be; and by attempting to create slavery in the State under the power of the State, and not of the United States.

A territory of the United States is not *ipso facto* a slave territory, but the contrary. Jones *v.* Van Zandt, 2 McLean, 596. 611. California was a State, and the master bringing them here manumitted them; 1 Morris, 1; cited in U. S. Dig. for 1848, p. 335, No. 23; Blackman *v.* Phil, Yerger, 452; Hunter *v.* Fulcher, 1

Leigh, 172; 3 U. S. Dig. 474, No. 214; Button *v.* Hopper, 1 Wash. C. C. Rep. 499; 3 U. S. Dig. 474, No. 220; Ex parte Simmons, 4 Wash. C. C. Rep. 396; 3 U. S. Dig. 478, No. 308. But if the Constitution did not go into operation till the slaves were brought here, they and their master become subject to its influence and become free. 5 Pet. 505. To call section 4 a "police law," is giving up the whole matter. See Prigg *v.* Commonwealth of Pa., 16 Peters, 682–3. 657; Holmes *v.* Jameson, 14 Peters, 568–9. It was not intended for, nor does it purport, or pretend to be a "police law." It has no one characteristic of such a law. It does not point to any evil to be remedied. It has none of the sanctions of such a law. It requires nothing to be done. It requires nobody to do that nothing. For such a purpose, it is not a law at all. It is simply a privilege given to a non-resident to do something *if he pleases.* It is intended, and is an exercise of an authority supposed to be held under the Constitution of the United States.

MURRAY, Chief Justice, and ANDERSON, Justice, severally delivered opinions.

. MURRAY, Chief Justice.—The petitioners were arrested under the provisions of an act concerning fugitives from labour, passed April 15th, 1852, upon satisfactory evidence that they were slaves by the laws of Mississippi, were brought to California before her admission, and had upon demand refused to return to said State. ·The magistrate before whom this examination was had, delivered them over to the custody of their owner, to be removed from this State, according to the provisions of the 4th section of said act. A writ of habeas corpus was afterwards sued out by the prisoners, returnable before the Judge of the Judicial District, which was dismissed upon hearing; and the prisoners remanded to the custody of their owner. Application was then made to one of the justices of this Court during vacation for another writ, which was granted, returnable on the first day of the . term. Upon the coming in of this writ, it is contended that this is an original proceeding, of which every judge of a Court of Record has cognizance; and that the question having once been adjudicated by a Court of competent jurisdiction, this Court has no authority to review that decision.

The acts concerning "writs of habeas corpus," passed April 20th, 1850, has vested the power of hearing and determining writs of habeas corpus in the judge of every Court of Record in the State; it is a mere chamber proceeding, a summary mode of determining whether a party be properly held in custody. The final determination is not that of a Court, but the simple order of a judge, and is not appealable from or subject to review. The doctrine of *res adjudicata* cannot apply to such determinations.

The judge who issued the present writ, alone has power under the provisions of the act to determine this case; and the presence of the other members of this Court is not required by law, although a desire to settle this question may induce us to advise in its adjudication.

The statute never contemplated that a judgment upon one writ should be a bar to any further proceeding, but looks to a different result; and any prisoner may pursue his remedy of habeas corpus until he has exhausted the whole judicial power of the State.

How far judges would go in their examination after a case had once been determined, is a question which must rest exclusively in their own sound judgment; but a previous examination cannot prevent their right to re-examine the whole case if they should think proper to do so.

The questions involved in this case are as various and delicate as they are important; and it is not improper to say that more embarrassment has arisen from the phraseology of the act under consideration, than from the principles intended to be recognized by it. The first position assumed by the prisoner's counsel, and one which it is necessary for this Court to determine *in limine* is, "that the power to legislate upon the subject of fugitive slaves belongs exclusively to Congress, and the States have no concurrent power over the subject." If this be true, in fact, then the case of the master falls.

This argument is mainly predicated upon the decision of the Supreme Court of the United States, in the case of Prigg *v.* The Commonwealth of Pennsylvania, 16 Peters, an examination of which and the questions involved, are necessary to a proper understanding of the present case.

Edward Prigg, a citizen of Maryland, was indicted in the State

of Pennsylvania for kidnapping a negro woman and her children, under an act of said State, which provided, that any one who should by force and violence take and carry away, &c., &c., any mulatto, or negro, from any part of the commonwealth, with the design of selling, or disposing, or keeping such mulatto, or negro, as a slave for life, or any other term, he and his aiders and abettors on conviction thereof should be punished by fine, &c., &c.

Upon the trial of the cause, the jury found the fact, that said negro woman was a slave for life by the laws of Maryland, and had fled to the State of Pennsylvania; that Prigg, as agent of her owner, obtained a warrant, and caused said negro woman to be taken before a justice of the peace as a fugitive slave, who refused to take jurisdiction of the case.   Whereupon Prigg carried her to Maryland and delivered her to her owner.

The jury found a verdict of guilty; the case was taken to the Supreme Court of the United States, where the judgment of the Court of Pennsylvania was reversed, on the ground that the act of that State was unconstitutional, and in conflict with the act of Congress upon the subject of fugitive slaves.   After discussing the constitutionality of the act of Congress, and other questions arising in the case, Judge Story, in delivering the opinion of the Court says, "The remaining question is, whether the power of legislating upon this subject is exclusive in the national government, or concurrent in the States until its exercise by Congress.   In our opinion it is exclusive."   After giving the reasons of the Court he proceeds to say: "To guard, however, against any possible misconstruction of our views, it is proper to state, we are by no means to be understood in any manner whatsoever to doubt, or interfere with the police power belonging to the States, in virtue of their general sovereignty; that police power extends over all subjects within the territorial limits of the States, and has never been conceded to the United States.   It is wholly distinguishable from the right and duty secured by the provisions now under consideration, which is exclusively derived from and secured by the Constitution of the United States, and owes its whole efficacy thereto.   We entertain no doubt that States, in virtue of their general police power, possess full jurisdiction to arrest and restrain runaway slaves,

and remove them from their borders, and otherwise to secure themselves against their depredations and evil example, as they certainly may do in the case of idlers, vagabonds, and paupers. The rights of the owners are in no just sense interfered with, or regulated by such a course; and in many cases the operation of this police power, although designed for other purposes, for the protection, safety, and peace of the State, may essentially promote and aid the interest of the owners. But such regulations can never be permitted to interfere with, or obstruct the just rights of the owner to reclaim his slave, derived from the Constitution of the United States, or the remedies prescribed by Congress to aid and enforce the same."

The exclusive power of Congress to legislate upon a given class of subjects, has long been a fruitful source of political discord; but the instances in which the power is exclusive, or concurrent with the States, is too firmly established by precedent and authority to be questioned at this late day; and the difficulty consists, not so much in ascertaining, as in the application of the principle. In the 32d No. of the Federalist, the legislative power of Congress is said to be exclusive.

1st. When the power is expressly granted.

2d. When the power is vested in the general government, and prohibited to the States.

3d. When the exercise of a power by the States would be contradictory, and repugnant to the exercise of a rightful power, by the general government. This construction has been recognised by the Supreme Court of the United States, in Sturges v. Crowningshield, 4th Wheaton; and in Gibbons v. Ogden, 9th Wheaton. These authorities are cited and relied on in the case of Prigg, but a majority of the Court were of the opinion that this subject came within the third class of cases just enumerated; that the exercise of this power by the States, was inconsistent, in consequence of the conflict of State regulations, which might arise from political and geographical differences and prejudices. How far they were right in this assumption, needs but an examination of the reasoning to say. It never was contended that the States could pass any law, in any way limiting or interfering with the rights secured to the master by the Constitution and acts of Congress. No one was compelled to seek the forum of

State tribunals, unless by his own election; and if the free States, actuated by motives of comity, or in a spirit of compromise towards their sister States, chose to extend other facilities for the recovery of this species of property, than those provided by the laws of Congress, it would seem that they were but exercising a power strictly within their control, by reason of their territorial jurisdiction over the subject.

The exercise of similar powers by the States, for their own protection and government, after Congress has legislated, has been acquiesced in for years.

The 4th article of the Constitution concerning fugitives from justice, provides:

"A person charged in any State with treason, felony or other crime, who shall flee from justice and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the crime."

This declaration is in phraseology almost identical with the one concerning fugitive slaves.  Yet every State within my knowledge, notwithstanding Congress has legislated upon this subject, has passed laws for the delivery of this class of fugitives.  So that the remedy provided by Congress is seldom resorted to, and this right of legislation has never, so far as I am informed, been questioned.

Perhaps it may be said that the States exercise this authority by virtue of their police powers.  The commission of a certain act, though felony by the laws of Massachusetts, may not be so here, any more than colour may be the presumption of slavery; and the right of the States to legislate in the one case, is as absolute as in the other, whether that right be claimed by virtue of police power, or belongs to the States as an original attribute of sovereignty.

Again, the Constitution, art. 4th, sec. 1st, declares, that "full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State; and Congress may by general laws, prescribe the manner by which such acts, records and proceedings shall be proved, and the effect thereof."

28

Congress has provided the mode in which records, &c., shall be authenticated, and it might be contended with equal plausibility, that any further legislation, upon this subject by the States, would produce confusion and difficulties; yet the power of the States to legislate upon this subject, provided such legislation does not contravene the act of Congress, and admit the records and the judgments of other States to full effect when clothed with less ceremonies of authenticity, has ever been insisted on and exercised, and was affirmed by the Supreme Court of Kentucky in 2 Munroe.

It is scarcely necessary for me to multiply arguments, or to cite the many instances in which the States have exercised a concurrent power of legislation over subjects not expressly delegated to Congress or prohibited to the States, the concurrent exercise of which might in many imaginary instances became inconsistent.

This subject has been fully reviewed by Chief Justice Taney. In his dissenting opinion he says, " The Constitution contains no words prohibiting the several States from passing laws to enforce this right. They are in express terms forbidden to make any regulation that shall impair it. But there the prohibition stops; and according to settled rules of construction for all written instruments, the prohibition being confined to laws injurious to the right, the power to pass laws to support and enforce it, is necessarily implied. * * * * Why may not a State pass laws to protect a right of property acknowledged by its own paramount law? The laws of the different States in all other cases constantly protect the citizens of other States in their rights of property when found in their respective territories, and no one doubts their right to do so. I cannot understand the rule of construction, by which an express stipulation for the security of certain individual rights of property in the several States, is held to imply a prohibition to the States to pass any laws to guard and protect them." It is not improper to say that this question was not raised by the record, or necessary to be passed on in the decision of the case, and the Court departed from its usual practice, and well settled rules of construction in determining it. Chief Justice Taney, Justices Baldwin and Thompson dissented from the opinion, and upon a whole examination of the argument,

it is not improbable that when this point shall again present itself for the adjudication of that tribunal, a different construction will be given.   Be that as it may, I feel no disposition to sacrifice or surrender any right, which may probably belong to this State, upon what I conceive to be mere dictum, emanating as it does even from the Supreme Court of the United States.

To relinquish the right of legislation in every case, where conflicts and clashings of jurisdiction may be imagined, is to yield up the right of States altogether.   The *argumentum ab inconvenienti* is always a dangerous one.   The corrective can easily be found; and when these conflicts do occur, the State regulations must give way; but it is not proper to declare this law void, because it would have been clearly unconstitutional if its provisions had been different.   Such a conclusion would be unsound in logic and in law.   The first three sections of the act, now under consideration, do not alter the act of Congress of 1850, further than by confining jurisdiction on the State tribunals over the subject.

How far this is legislating upon the subject of fugitives from labour, within the meaning of the decision relied on, I am unable to say.   The act of Congress does not prohibit jurisdiction over this class of cases.

Before the adoption of the Constitution of the United States, Maryland, South Carolina and Connecticut, and other States had legislated upon this subject, and the Courts of these States took cognisance of these cases; and it may be, the State tribunals could entertain concurrent jurisdiction, without any grant of power; if so, certainly an act, recognising this authority upon the part of the States, would not be void.

In fact, the right of the States to confer this jurisdiction upon their tribunals, appears to be partially recognised by the Court in the case cited.   The act of 1793 authorised the arrest of fugitives, and required them to be taken before any judge of the District or Circuit Court, or before any magistrate of any city, county, or town corporate.   It has been well settled by the decisions of various Courts, that Congress cannot impose any judicial duty upon State Courts, or communicate its exercise to those who do not hold the commission of the general government.

The imposition then, of this power, was a nullity; yet the Court says, "Whatever doubt may exist on this point in different States, none is entertained by this Court, that State magistrates may, if they choose, exercise this authority, unless prohibited by State legislation."

Here there was an unconstitutional obligation imposed upon, and repudiated by the State; the Court recognises the right of the States to forbid or allow its exercise, *pro tanto;* this would be legislating upon the subject. If this portion of the act was void, the State Courts only exercised this authority by virtue of original jurisdiction or legislative enactment; but a recognition of this same jurisdiction by our State legislature, because Congress has dropped this unconstitutional provision, as now contended, works a total failure of the whole act.

But if I am wrong, and this power, as an original or concurrent one, is destined to be swallowed up in the maëlstrom of federal centralization, still, by the same decision, the right of the States to legislate upon this subject, for police purposes, and their own internal government, is fully recognised.

Humiliating as it may be to resign this attribute of sovereignty, we are disposed to avail ourselves of this power, disguised as a police regulation, for the protection of the State from this obnoxious class of population. This right has never been denied, but is specially recognised as belonging to the States. It was held by the Supreme Court of Illinois, in the case of Willard *v.* The People, that an act of the State legislature, making it a criminal offence to harbour or secrete fugitives from labour, was not unconstitutional.

This decision was made in view of the case of Prigg *v.* Pennsylvania, and before the question of slavery had become so important an element of political discord, as to endanger the safety of our Republic, exciting the bitter animosities of interest, sectional feeling and fanaticism, and threatening the integrity and permanence of the Union itself.

Having then shown that the exercise of this power by the States, is not *per se* unconstitutional, I have answered one of the main arguments of the prisoner's counsel, viz., that the first three sections of the act, being void by reason of the exclusive

power of Congress to legislate upon the subject, the fourth must fall by its relation to them.

It now remains for me to examine the fourth section, under which this controversy originated. The language is as follows : "Any person or persons held to labour or service in any State or territory of the United States by the laws of such State or territory ; and who were brought or introduced within the limits of this State previous to the admission of this State, as one of the United States of America; and who shall refuse to return to the State or territory, where he, she or they owed such labour or service, upon the demand of the person or persons, his or their agent or attorney, to whom such labour or service was due, such person or persons so refusing to return shall be held and deemed fugitives from labour, within the meaning of this act; and all the remedies, rights and provisions herein given to claimants of fugitives, who escape from any other State into this State, are hereby given and conferred upon claimants of fugitives from labour, within the meaning of this section ; provided, the provisions of this section shall not have force and effect after the period of twelve months from the passage of this act."

It will be observed that this section gives no claim to the owner, and vests him with no right except for the deportation of this class of inhabitants. Much embarrassment has been thrown around this case in the argument under the supposition, that the freedom of the prisoners was to be determined.

This Court has no power to decide this question in the present form of proceeding. As before remarked, this is a chamber proceeding, and the Justice who issued the writ under the statute concerning habeas corpus, might very well have refused to go further than the commitment, had not public convenience demanded a judicial construction of this law. That it would be impossible for the Legislature of this, or any other State, to pass any such act by which persons free would be reinstated in slavery, no one will deny. But it is equally well established that the States for their own safety may exclude any obnoxious class of inhabitants; and the fact that the Legislature, in this particular instance, have committed this charge to those who owned these persons as slaves in other States, cannot add to or diminish the unconstitutionality of the act under consideration. In com-

mitting them to the custody of their owners for the purpose of extradition, the State has but discharged a moral obligation to many of her citizens, who brought this species of property to a territory of the United States, under the supposition that it was protected by the flag of the country, and the compromises of the Constitution. The right of these prisoners to their liberty is as safe in the hands of the Courts of the slaveholding States, as it possibly could be here. If they are free, it will so be held; but if it should be otherwise, then this State will have the satisfaction of having performed its obligations to many of its citizens.

It is said this act was not intended for, and does not purport to be a police law. I am not aware that any set form is required in the enactment of a police regulation, or that it is necessary by preamble to set forth the grievance and the remedy intended to be enforced.

This subject, as well as the increase of free negro population, has for some time past been a matter of serious consideration with the people of this State, in view of the pernicious consequences necessarily resulting from this class of inhabitants ; so much so as to become the subject of a message from the Executive of the State more than a year and a half ago. Although I have no doubt that the section of the act now under consideration, was originated for the purpose of securing the rights of the master, yet I am satisfied the desire to purge the State of this class of inhabitants, who, in the language of a distinguished jurist, are "festering sores upon the body politic," entered largely into the consideration of the Legislature in passing this act.

If it can be maintained, it is the imperative duty of the Court to uphold it. Courts ought not on slight implication "or vague suspicion to declare a law unconstitutional," but by every settled rule of construction, are bound to suppose that the legislature had some proper motive in view; and if a bill by one construction would be unconstitutional for a certain purpose, but by another construction constitutional for certain other purposes, they must adopt the latter.

It is said the 4th section is void, because it attempts what is beyond the reach of legislation, by saying that a thing shall be deemed to be what it is impossible to be. It will scarcely be contended, that this language of the 4th section has, or could

have the effect of making one who was brought to the State without his own volition a fugitive slave.   In fact, this would be a moral and physical impossibility, which no body of men could fairly be supposed to have attempted.   The intention was simply to place these persons in the category of fugitives from labour, for the purpose of extending the provisions of the law over them; but to change their actual *status* was a power alike beyond the control and intention of the legislature.

Again, it is said that slavery is a municipal regulation, founded on and limited by the range of the territorial laws; that slavery was prohibited by a decree of the Mexican Congress, and did not exist at the time of the acquisition of California; that the laws and municipal regulations of Mexico remained in force until changed by the new sovereignty; and consequently, slavery was expressly prohibited by virtue of the laws of Mexico up to the time of the adoption of our State Constitution.   I shall not attempt to dispute the correctness of some of these propositions, although I cannot admit the conclusion drawn from thence by the learned counsel.   Slavery may be admitted by custom, and is said to have been introduced in all modern States, except some of the colonies of Spain, without any act of legislative recognition; but there must be some positive municipal law to entitle the master to assert a right to, and exercise acts of ownership over the person of the slave; so that the master may possess a property in his slave by custom, and still be unable to control him for want of some positive law regulating this species of property.   Although slavery may as between separate States be considered the creature of municipal regulations, still the Constitution of the United States recognizes a property in this class of persons, and the institution of slavery is a social and political one.

While I am willing to admit for present purposes (although I have heretofore denied the application of these laws to property, and contracts made by Americans after the acquisition of this country), that the laws of Mexico remained in force until changed by the act of our legislature.   I do so, because I regard slavery as a political institution; and the rule is well settled, that the political laws of the ceded or conquered country give way to the acquiring country.

It is said that the Constitution of this State but affirmed the laws of Mexico; that the Constitution prohibits slavery or involuntary servitude; and that, after the adoption of a State Constitution, the power to control its own internal police and municipal affairs, is as ample before as after its recognition by other States. This is true; but at the same time it does not follow, that while a State may have power to control her own police, before her admission into the Union, she has any authority to impair the obligation of rights subsisting under the federal Constitution. If the slaveholder possessed any authority to bring his slaves here under the Constitution of the United States, that right could not be abridged, or controlled, until the admission and recognition of California as an independent State by Congress.

To make the act of Congress admitting this State into the Union, relate back to the formation of the State Constitution, would be a dangerous recognition of power. While we may be disposed to consider the State government fully pledged as to internal policy and municipal control, at the adoption of its Constitution by our citizens, still in all cases of rights arising under the Constitution and laws of the United States, the absolute sovereignty of the State can only date from her admission. It is said this act is in violation of section 10, Article I. of the Constitution of the United States, which provides, that no State shall pass an *ex post facto* law. This act cannot properly be called an *ex post facto* law. Its operation is neither criminal nor penal. It does not, as before remarked, purport to impair any right, or to constitute the act of refusing to return to servitude a crime. It simply provides for the deportation of slaves brought here before a certain period; and its provisions contain nothing which would warrant us in assuming it to be an *ex post facto* law.

Again, it is said this law impairs the obligation of contracts. I have as yet been unable to understand the exact bearing of this objection. The State of California has certainly not entered into any contract with free negroes, fugitives, or slaves, by providing in the Constitution, that neither slavery nor involuntary servitude shall exist in this State, which would prevent her, upon proper occasion, from removing all or any one of these classes from her borders.

If, by impairing the obligation of contracts, I am to understand that the State Constitution has guaranteed liberty to all; that the slave having been brought here, becomes free, and that it is the duty of the State tribunals to maintain him in that right; then I answer as before, this act does not attempt to deprive him of that right, and the power would be beyond the control of the legislature, even if the legislature should attempt to exercise it. Whether a slave becomes free when voluntarily taken to a free State by his master, is a question upon which the wisest jurists have differed, and one which I do not propose to discuss, considering it, as I do, foreign to the present case. The weight of authority in my opinion is, that the slave does not become *ipso facto* free, or that his status is changed; but that the master's control ceases for want of some positive law authorizing its exercise. It has been held, however, in Courts, both in England where it is the boast that the air is so pure, that when once inhaled by a slave his shackles fall off, and by Courts in the United States, that if the slave voluntarily return to the domicil of his master, the laws of the domicil and the state of slavery re-attach; or that this act could not operate as destroying a vested right, or impairing the obligation of contracts; but merely as a remedial statute, for the purpose of securing to the master a right which existed, but was in abeyance for want of positive law to enforce it.

Many of the free States with constitutional provisions similar to ours, have provided, that the owners of slaves might retain them within their jurisdiction for a limited time, for the purpose of making a transit through the State, or otherwise; and I have never heard of their right to do so being seriously questioned, on the ground, that it impaired the obligation of contracts, or violated any portion of their Constitutions. In fact Courts have, in the absence of legislative enactments in free States, sustained this right, upon the principles of comity. It is contended this act is unconstitutional, because it is said to deprive the prisoners of the right of trial by jury. Sect. 3, Art. I. of the Constitution provides, "that the right of trial by jury shall be secured to all and remain inviolate forever." This language does not enlarge or abridge the trial by jury, as known at common law, and has so been expressly held by this Court.

I do not understand that the rights of the slave are determined by the arrest and commitment. It might be said with equal plausibility, that the fugitive slave law passed by Congress, is unconstitutional, because it dispenses with a jury, or that even this examination upon habeas corpus, cannot be conducted without the introduction of a jury.

Had the statute attempted to settle the right of the slave to his liberty, or if it involved any question of property or punishment, in that case the prisoners would have been entitled to a jury trial; but such is not its effect or intention.

In conclusion : the fourth section of this Act assumes to control a certain class of citizens over whom this State has jurisdiction. I have already attempted to show that the first three sections of the fugitive slave law of California are not unconstitutional. Over the persons included in the fourth section, Congress has no power to legislate whatever. If it should attempt to do so, every doctrine of State rights would rise up in rebellion against this usurpation of power. That is a subject peculiarly within the control of the States, the exercise of which can in no just sense be interfered with by any one. By virtue of her police power, it is competent for this State to expel this class of persons from her territory. She has done so, and I see no reason why this law should not be enforced.

With the wisdom of the law, or the question of slavery, this Court has nothing to do. Many wise men have honestly differed in opinion upon the subject, and a proper respect for those opinions forbids me from unnecessarily expressing my own private views. Happily removed from the locality and scenes of excitement growing out of this subject, it is the duty of this Court to eschew all sectional considerations, and extend that comity to every other State of the Union, consistent with the integrity and welfare of her own.

The judgment of the Court is, that the writ be dismissed, and that the slaves Robert Perkins, Carter Perkins and Sandy Jones be remanded to jail into the custody of the Sheriff of the county of San Francisco, and by the said Sheriff delivered to the master or his agent, without delay or cost.

ANDERSON, Justice.—It would be a waste of time to discuss

any questions as to the right and extent of the writ of habeas corpus, and the incidents of it.  They are not necessary to the decision of the case before us.  It is desirable to dispose of it, exclusively, upon its legal merits.

The policy of our government has been peculiar upon this subject, and we must always be at fault in any investigation in which we disregard this fact.  In the consideration, therefore, of opinions and authorities, outside of our own constitutions and laws, and in comparison with them, we must be careful to assign but a secondary place, and in no event, a counteracting weight.

The act, under which Robert Perkins, Carter Perkins, and Sandy Jones have been taken as slaves, was passed at the late session of the Legislature.  The first, second and third sections are substantially a repetition of the Fugitive Law Act, passed by Congress.  The fourth section, particularly, provides for the reclamation of slaves brought here prior to the admission of this State into the Union.

The fifth section provides against their being held as slaves after reclamation, except for the purpose of removal from the State.

It has been objected that this act contained provisions, which are illegal, contrary to established decisions in reference to the domicil of slaves, and to the Constitutions of the United States, and of this State, and of the laws of Mexico, which, it is insisted, prevailed in this territory, after the treaty in regard to emancipation.

The entire theory advanced by the counsel for the prisoners, in respect to the first part of the objections, as to the domicil of the slave, is wholly inapplicable to this case.  It rests exclusively upon the Constitutions of the United States, and of this State, and on the laws passed by the latter.  The action on the part of the Mexican government had an incidental relation to the subject, only so far as it affected Mexican citizens, and did not conflict with the Constitution of the United States.

The doctrine maintained in the Court of Appeals in Virginia, is, that the temporary residence of a slave in a free territory does not *per se*, work a manumission, but that it is simply equivalent to a passage through the State, if the *animus revertendi* existed on the part of the master in relation to him.  Lewis

*v.* Tullerton, 1 Randolph, 22.    The case originated in Ohio, after the adoption of the Constitution of that State, and was tried in Virginia, at the suit of the slave Lewis after he was brought back there    This idea is founded upon *that basis* of the institution of slavery which *classes it as property*, and is in conformity with the Constitution of the United States.

The great blunder which is committed by those who consider this subject, having all their sympathies against slavery, is, that under that state of feeling, they never regard the slave as property.    But it is not a question of feeling to be adjusted—it is an institution, agreed to by government in such form as to make it both political and municipal, and under which the slave does not possess equal civil rights with the freeman—nor can this be changed by any residence where it is made with the intention to return.    A shade of difference is not perceptible in the principle involved between this and the actual passage by a master and his slave through a free State.  The latter is treated with regard to the will of the master to take his property back from whence he brought it.    This view of the subject is taken by the act of Pennsylvania in 1780.    The amendatory act of that State of 1788, likewise maintains this.    It is true, the exception in that statute was designed to embrace the cases of members of Congress, but it is, nevertheless, a recognition of the general principle; and when afterwards in the Supreme Court of Pennsylvania it is brought under consideration, in the matter of the slave belonging to Mr. Chevis, the argument of the late Mr. Sergeant, a lawyer, distinguished for his legal ability, and large experience, takes broadly the ground that the true intent and policy of the act was to pay respect to the other members of the confederation.    And the opinion delivered by Chief Justice Tilghman at the final decision upon the writ of habeas corpus in that case, mentions, with a respectful consideration not to be disregarded, in the construction of such a law, *the cause* of the *original basis* of the compromise of the Constitution of the Republic, and declares that a union with the Southern States could never have been cemented without yielding to their demands on this point.    There is no doubt that such was the policy contemplated by that great national convention, and so felt and understood by all the States, and particularly by those of the South.    If this

be so, the principle which is actually embodied in the decision of that case, as of statutory origin, goes further back than that, and was inherent in the frame-work of our government, and should have been respected even without the enactment of any law. Lewis v. Holloway, 6 Binney's Rep. pp. 216–17.

The contrary assumptions, on the other side, are equally extravagant, and adverse to the fundamental policy of the general government, and its origin. But we are not at liberty to presume the legal existence of any principle or policy of an adverse character to that which sustains our theory of government. To do so, would be to establish a doctrine, the effect, and the consequences, and the power of which, would be self destruction.

These views, taken at large, are further sustained by the Supreme Court of Pennsylvania in another case; that of the Respublica v. Richards, Dallas's Reports, vol. 2, pp. 225, 226, and so on. But the doctrine is also fully maintained by the Supreme Court of the United States, in the case of the United States v. Skiddy.

That case involved directly the question of domicil of the slave Priscilla, and turned upon the doctrine of residence. The vessel Garonne, was libelled for a violation of the act of Congress of the 20th of April, 1818; which was intended to prevent the importation of negroes or mulattoes, with intent to sell or hold them in slavery. This act was designed as the last blow to the slave trade.

The facts of the case were, that Mrs. Smith, a widow lady of Louisiana, had visited France for the purpose of a temporary residence, and had taken with her the slave Priscilla. Afterwards, the son-in-law of Mrs. Smith procured the shipment of Priscilla on board the ship Garonne, from Havre to New Orleans; and on her return she lived at the house of Mrs. Smith as a slave.

The suit was brought to obtain the forfeiture of the vessel, for having shipped Priscilla as a slave, contrary to the act of 1818, referred to. This idea was founded upon the doctrine, that the temporary residence of Priscilla in France, made her free; that she, by that residence, ceased to be an inhabitant of Louisiana, and was therefore within the purview of that act. As a slave, not having changed that character, her being brought back to

Louisiana, would not have been a good ground of complaint. The act had no relation whatever to slaves actually held to service in the United States, but to persons who might be brought here, to be reduced to that condition.

The Court, however, considered. the case as in any of its respects, not within the statute. But the particular doctrines laid down as to residence, were involved in the issue. Chief Justice Taney delivered the opinion of the Court. He said that, even assuming by the French laws, that Priscilla was entitled to her freedom upon her introduction into that country, the Court was. of the opinion that there was nothing in the act of Congress to prevent her mistress from bringing her back to her place of residence, and continuing to hold her as before in her service.

This view was founded upon the idea, that the temporary sojourn of Priscilla in France, had not changed her residence, and she had not become an inhabitant of a foreign country.

The Chief Justice said, that although the girl had been staying for a time in France in the service of her mistress, yet in construction of law, she continued an inhabitant of Louisiana; and her return home was not the importation of a slave; 11 Peters, p. 75, 76. In the case of the United States v. The Arminstad, 15 Peters, p. 590. 593, analogous doctrines are maintained and enforced, in relation to the slave Antonio, who was surrendered to the Spanish vice-consul, for the benefit of the legal representatives of Ferrers, who had been murdered by the negroes on board of the vessel. Those negroes were declared to be free, upon other and very distinctly different grounds.

They were not considered as coming within the provisions of any of the Acts of Congress, prohibitory of the slave trade. Nor did the negroes design to import themselves into the United States. They were considered as free in the first instance, and not as under any treaty with Spain; but the case of Antonio was entirely different. He was a Spanish slave, the property of Ferrers, and was spared by the negroes, who murdered his master. He was brought into the United States at the same time, and was treated as property, and restored to his owner under the affirmance by the Supreme Court of the United States of the decree of the Circuit Court. In that case Judge Story delivered the opinion, and said in connection with this view of the subject, that "if

these negroes were at the time lawfully held as slaves, under the laws of Spain, and recognized by those laws as property, capable of being lawfully bought and sold, we see no reason why they may not justly be deemed within the intent of the treaty to be included under the denomination of merchandise, and as such ought to be restored to the claimants."

While it is true that Antonio was surrendered to his owner, under the stipulations of the treaty with Spain, that treaty itself is high authority as to the principle involved, because they were recognized by the United States as one of the high contracting parties.

The case must be received also as embodying the opinion of the Supreme Court, in relation to slaves being treated as property, and to their restitution. If there was anything in this provision of the treaty obnoxious to the Constitution of the United States, it would have been *quo ad hoc* nugatory.

The doctrine, therefore, may be considered as settled, in the range of cases referred to, first, that a temporary residence of a slave in a free state with or without the consent of his master, does not change the place of his permanent residence; secondly, that such residence does not change his servitude; thirdly, that under whatever political institutions of a sovereign State, that temporary residence existed, the relations of the slave to the master are to be determined exclusively by the Constitution and laws of the country, of which he is properly the inhabitant, and to which he may return; and fourthly, that the slave is *property*, and so to be judicially regarded. The doctrine in the cases stated takes this full extent; any other would lead, in our country, practically to endless confusion, and would, in effect, destroy the spirit of our government.

The question of residence, as far as it may be in any way considered applicable to the condition of things in the United States, is not as to the status of slavery. What would be the judicial decision in a foreign country, where the slave might have temporarily remained, and where there was no law to protect and secure that relation?

If the matter was there tried, their tribunal could not give effect to the status, however legal it may have been in the coun-

try, in which the person was born, and of which he was the actual inhabitant.

There would be no law to authorize this. It would be treated in such a view of the case exclusively as a municipal regulation. But the true question is, what is the condition of that slave in the country where the status of slavery is legal, and as to whom no change of actual residence and inhabitancy has taken place. This was the doctrine recognized in England from 1729 to 1771, and finally, in the case of Somerset, it was ruled that the local law loses its force, because the *comitas inter communitatus* could not require its enforcement. Burges' Colonial Foreign Laws, vol. 1, p. 738, and so on. This, however, does not interfere with the question of what constitutes a change of inhabitancy, and which necessarily comes up within the local jurisdiction which asserts slavery upon the return of a slave after a temporary absence.

That foreign power which does not recognize the status of slavery, we perceive, is not bound to act in such a case, by the *comitas inter communitatus*, and so the converse of that proposition is equally true, that the power recognizing slavery is not bound by the *comitas inter communitatus* to respect, in the slightest degree, that which is contrary to its own laws, as observed by the other sovereignties.

The simple question is, therefore, as to what residence creates or changes inhabitancy. Story's Con. Law, p. 489. So our highest Courts have ruled and settled. I have made a reference to this distinction, with a view to show the importance of regarding it with due consideration. If this is not done, it is useless to pursue any inquiry in relation to it whatever. This distinction as to the Somerset case is fairly stated, and the fullest force is given to that new position which was assumed then by Lord Mansfield. Prior to this, in 1762, in the Court of Chancery, under Lord Chancellor Northington, the case of Shanly *v.* Harvey, referred to by Lord Stowel on the trial of the slave Grace, (and will be found in 2 Eden, 126,) may be considered as furnishing the type to that doctrine. But it went no further for many years, and remained almost an obsolete precedent, having no other effect than as a solitary mark of departure from the uniform policy of half a century, erecting itself on the verge of that time, when there were no less than 14,000 slaves in London.

After the period of 1771, but few cases occurred having any very great affinity to the Somerset trial, down to the date of 1827, during a period of fifty-six years. Then came the case of the slave Grace, upon an appeal from the Vice Admiralty Court of Antigua. As any review of the entire doctrine upon this subject would be incomplete without a notice of this, I shall very briefly follow the learned judge, who delivered the opinion, presiding in the high Court of admiralty in England.

Grace accompanied her mistress to England, and resided with her there in 1823, an entire year, and returned with her to Antigua. In 1825, she was seized by the waiter of the customs at Antigua, on the suggestion of having been illegally imported. Mr. Allen, the husband of Mrs. Allen, defended as claimant. The judge of the Vice Admiralty Court of that island decreed, after argument, that the woman Grace be restored to the claimant, with costs and damages for her detention. From this sentence an appeal was prosecuted on the part of the crown. George Wyke v. John Allen, Haggard's Admiralty Reports, vol. 2, p. 95.

The high Court of admiralty affirmed the sentence of the judge below. And Lord Stowell, in stating his opinion, entered at great length, and with masterly ability into the examination of the whole subject. He said, that the sole ground upon which her freedom was asserted, was, that she had been a resident of England sometime as a servant, waiting upon her mistress, but without the enjoyment of any manumission that could deliver her from the character of a slave, which she carried with her when she left Antigua. And he added, "I think it demonstrable that she could derive no character of freedom that could entitle her to maintain a suit like this (founded upon a claim of permanent freedom), merely by having been in England without manumission,—for a manumission is a title against all the world." He added elsewhere, "that manumissions are not uncommon in England, and always granted where there is an intention of giving the party an absolute title to freedom." It appears, that in 1749, Sir Philip Yorke, then Chancellor Hardwicke, sitting in the Court of Chancery, decided, that a slave coming from the West Indies, either with or without his master to Great Britain, doth not become free; and that his master's property, or right in

29

him, is not thereby determined or varied.   Lord Stowell said,
"The fact certainly is, that it never has happened, that the
slavery of an African returned from England has been inter-
rupted in the Colonies."   Farther on he expresses the same idea
thus, "the slave continues a slave, though the law of England
relieves him in those respects from *the rigours* of that code while
he is in England, and that is all that it does."   The temporary
freedom thus acquired, has ever been superseded upon the re-
turn of the slave, and slaves never have been deemed and con-
sidered as free persons on their return to Antigua, or the other
Colonies.

Judge Story, in his Conflict of Laws, p. 93, and notes, takes
probably the true distinction as to the temporary condition
of a slave in England, that he ceases to be so, only because there
is no law which sanctions his detention in slavery.   But the very
reverse is the fact in this country.   The political nature of the
institution protected the rights of the master, in the absence of
any municipal legislation, and when the latter occurred upon
this subject in the State of California, it was no longer even de-
bateable—it was a fact—it was law.   But this will be more im-
mediately under our consideration, when I come to review a
different part of this case.   I mention it now, incidentally, merely
for the purpose of linking the chain of thought, as to the rela-
tions which the doctrine I have been examining bears to the
institution as it exists in our country.   The English system of
government differs materially from ours.   Theirs is a consoli-
dated and centralizing government, and one in which nothing
has been done for the remote parts of its great frame-work.   On
the contrary, everything has been done in ours for the promotion
of the interests of many States, by conceding much to each, and
protecting in good faith pre-existing rights.   England has been
a solid monarchy for a thousand years.   Ours is a confederation
of States, which could have no national existence, except by the
blending of certain political rights with particular municipal
regulations, upon a special basis agreed upon by all the parties.
I repeat the conclusion, that no temporary residence of a slave
under a new local power creates freedom or works forfeiture.

Here the Constitution of the United States was supreme, at
the date of the ratification of the treaty of Guadaloupe Hidalgo.

It was so with all its provisions, privileges and immunities—insuring equally to every citizen of each State, holding the territory open to the occupancy and property of all.   There was no supervening legislation of Congress, and, therefore, no question is raised as to whether that could ever have interposed.   But this will fall more properly under another part of the investigation; so that I postpone it.   To all this may be added, that slaves have been regarded as merchandize by all the judges of England, as well as by the most enlightened and the highest judicial tribunals in the United States; Burge's Colonial and Foreign Laws, p. 736.   In this volume we have the report of the English judges upon the memorial of the African Company, touching the Assiento, in 1689.

This was under the treaty of Utrecht, and by which, subsequently, subject to a new instrument, after the transfer of the contract, England bound herself to send 4800 negroes yearly, to Spanish America, for thirty years.   In the report of the Judges touching that Assiento, they said, in *hæc verba*, that *negroes are merchandize*.

These words may shock the sensibilities of many enlightened men, who have taken on peculiar sympathies upon this subject, but they assert a principle, as an incident of slavery, which has been recognised by Christendom for more than two hundred years, and to a certain extent it fortifies the entire doctrine which has been laid down, and we are bound to give it our judicial sanction.

As merchandize, no claim could be set up for them to foreign denizenship, whether their residence had been transferred either by design or accident, if after being returned to the country of their inhabitancy, they should sue for their freedom.   They are not the subjects of accident, and therefore not liable to any forfeiture.   Mr. Webster urged this rule, in his correspondence with Lord Ashburton in the Creole case; his Law of Nations, 726, 7, same volume.   Lord Ashburton's reply, p. 735, in which he says that the laws and duties of hospitality shall be executed.

But this whole doctrine may be considered as maintained by the policy of the treaty of Ghent, which provided for the restitution and compensation for slaves lost during the war.   In this, therefore, no residence in a free State, was allowed to be destruc-

tive of the status of slavery, and its rights. Whether restitution or compensation was made, the recognition of the principle now insisted upon, remained equally decided. The right of property was respected, and the pretence of forfeiture by reason of residence, abandoned. This case is strong, for it is founded upon that basis, by two high national contracting parties; and well may our judiciary carry out that principle, for it is but putting it in a modified form, and giving an individual application and practical direction to a great international construction of a very important question.

Enough has been said, as I think, to shew that the incident of residence interposes no difficulty in the adjudication; and I pass to other points, which were made by the counsel for the prisoners.

It has been contended, that the institution of slavery was purely municipal.

Starting at this point with such a proposition, it might reasonably be expected that we would be involved in great absurdities, utterly contradictory of our whole theory of government. The institution of slavery in the United States, is both political and municipal. Taking this fundamental basis to begin with, we stand upon the solid platform of truth, of law, of justice, of history, and of all that constitutes the safety and the strength of the Republic, *that great original compromise*, upon which the union of these mighty States began, and upon which, if honestly and faithfully preserved, it may rest securely forever.

If the institution in the United States were purely municipal, the question before us would be surrounded with more difficulty, and require more labour; but it is equally political and municipal. The highest of these in this case, if there be any distinction whatever, is the political. It is that which binds the States together, north and south; and without such bonds, this Union would be as a rope of sand.

Slaves are recognized by the Constitution of the United States as property, and protected; and that instrument provides for their representation in the particular form of federal members as prescribed, and they are made the subjects of taxation by the same rule. It was by adopting this, as a political regulation, that the Union was formed, and its peculiar character was agreed

to by every State.   It constitutes therefore a legal postulate, which marks the fundamental existence of our system, and is in itself stronger than any legal argument however redundant in intellectual power, or sustained by precedents and by exact analogies, and subtle distinctions.

But we have in this instance statutory provisions, reports, and adjudications coming in aid of that theory of our government upon which the question rests.

It is appropriate to repeat, that the political character of the institution of slavery goes with the extent of the national territory wherever that is; and the constitutional rights, and eminency of the Republic prevail at the moment of the accession of new territory.   Congress may modify the forms in which it shall be exercised, and regarded; but this must be " *sub modo,*" pursuant to that instrument itself.

Mr. Buchanan, while Secretary of State, in his letter to Mr. Voorhes, of October 7th, 1848, (Mr. Voorhes being an official of the government,) said, "The Constitution of the United States, the safeguard of our civil rights, was extended over California on the 30th of May, 1848.   The day on which the late treaty with Mexico was consummated."

This proposition will not, I presume, be controverted.

The Constitution is the supreme law of the land, and all laws, and treaties, must be in pursuance thereof.   The terms used in the second section of the sixth article as to treaties are, that they must be made by the authority of the United States, and this can only be exercised conformably to that instrument.

We come into this territory, therefore, under the full protection of the Constitution of the Union, and no government of whatever character, nor laws, nor treaties, could have a legal and binding authority which would be in any way contrary thereto.

But the true construction of the policy of our government will carry us a step further; and all that may be said as to the accession of the authority of the Constitution at the moment of the ratification of the treaty, applies with equal force to any conquest of priority, so far as it regards citizens of the United States.

The conquered people would retain certain rights, but not so

as to affect either the political, religious or municipal rights of the conquered, contrary to the Constitution.

It was urged by counsel as a sound argument against the law prescribing rules for the reclamation of slaves, that as Mexico had abolished slavery, those who were brought here were free under the Mexican law of emancipation. This is a mistake. The law of Mexico could only apply to the civil condition of the conquered. It could not prescribe a rule of conduct for the conquerors in regard to slavery. It could only have force, subject to the highest law of the Constitution of the United States. Thus, the prohibition by the laws of Mexico of all other religious worship but that of the Catholic system could not affect the conquerors, because that right was secured by the Constitution. So, the right of every citizen of the United States to emigrate to this territory, and bring his property with him was perfect, equal, and sacred. The property here brought into question is that of slaves. The Constitution of the United States was in full force here. Slaves were as much recognized by that as property, as any other objects whatever. There were no laws restraining the emigration of slaves. California had ceased to be Mexican territory, and was under the political institutions of the United States, whose government alone had the power to give executory effect to any law which should act upon American emigrants. It did disregard the Mexican law of emancipation, as it had a perfect right to do; and was so constitutionally bound, because, to have given to it effect would have been to nullify a political immunity secured to the people of the slave States, by the original basis of compromise to which all had agreed. The Mexican law was repelled by the political nature of the institution of slavery, and therefore became obsolete.

California, even as a sovereign State, cannot, by law, declare the slaves who were here at the time of its adoption into the Union, free, except as a forfeiture, under the penal sanction of an act, which might require their removal within a reasonable time after capture. A fortiori, that which a sovereign State could not do, a territorial government could not, if it had so attempted. It is not sovereign.

When the United States acquired the territory of California, it became the common property of all the people of all the States,

and the right of emigration with every species of property belonging to the citizens was inherent with its use and possession. By the 5th article of the amendments of the Constitution, it is expressly provided, "that no person shall be deprived of his property without due process of law, nor shall private property be taken for public use without just compensation." The 6th article declares, "that the Constitution and the laws of the United States, made in pursuance thereof, shall be the supreme law of the land, anything in the Constitution or laws of any State to the contrary notwithstanding." The Constitution of California must therefore be so interpreted as not to conflict with it. It is clear, therefore, that no organic or statute law of California can take away any right, or confiscate any property guaranteed by the supreme law of the land. These negroes, therefore, being property, as before shown, when brought into California so remained, and the present law for their reclamation is simply as it should be, executory of the 18th section of the 1st article of the Constitution.

In connection with all these views, there is another, which, to my mind, is perfectly conclusive. Separate and apart from all others it is entitled to great weight. The 18th section of the 1st article of the Constitution declares, "neither slavery nor involuntary servitude, unless for the punishment of crimes, shall ever be tolerated in this State. There is no provision there for emancipation. The owners of slaves, under that section had a perfect right, without anything further, to take them out of the State. The section asserts a principle, and so asserts it as to intend evidently future legislation to carry it out. It is, as it stands, inert and inoperative, and has so remained up to the date of the passage of the law now under consideration. It was of itself non-executory.

This principle has been conclusively settled by the Supreme Court of the United States in the case of Grove et al. *v.* Slaughter, 15 Peters, 499 and 500, and so on.

The opinion was delivered by Justice Thompson. The question was, whether the prohibition in the Constitution of Mississippi, as to the introduction of slaves for sale, per se, interdicts their importation and sale, or was directory, and required legislation. The learned Justice said, " There is every reason to

believe from the mere naked prohibition, that it looked to legis-
lative enactments to carry it into full operation. And indeed this
is indisputable. There are no penalties or securities provided in
the Constitution, for its due and effectual operation. Legislative
provision is indispensable to carry into effect the object of this
prohibition. It requires the sanction of penalties to effect this
object." He also adds, "The legislative enactments of this sub-
ject strongly fortify the conclusion, that this provision in the
Constitution was not understood as a prohibition, per se, but
only directory to the Legislature.

This is exactly parallel with the case now before us, and the
ruling of the Court is in conformity with this opinion. The
reason therefore, ex cathedra, and the legislation in this case
was not only wise, but a duty, if we are to consider the opinions
of the Supreme Court as a rule for our judicial guidance.

That constitutional provision of the eighteenth section is so
distinctly marked by the history of the times, that it is utterly
impossible to mistake the intention of the Constitution.

Slaves were known to be here, and it was well known that any
act designed to emancipate them would have prevented the ratifi-
cation of the Constitution by the people. It was good legal sense
not to attempt to do that which they had no power to do, and
that which they did do was the declaration of a principle, look-
ing to the aid of future legislation to carry it out. Strike the
present law from the statute book, and there is not a solitary
slave, who was brought here as such, but will remain so in the
absence of any other legislation. Even as it now stands those
who do not disturb their slaves, for the purposes of reclamation,
and taking them out of the country, are prevented by no law
from the use of their services. So far then the present statute
hath not the full extent contemplated by the eighteenth section,
but as far as it goes, it is constitutional, and obligatory, and
must be respected; and every good citizen ought to be willing to
lend his aid to carry it into effect.

The eighteenth section of the first article of the Constitution,
per se, is inoperative, and has no other executory character than
that within the extent of the late law. If it is designed to con-
fer it, then it must be by future legislation; as it now is autho-
ritative and directory to the Legislature. The argument is that

way, but beyond that, the question has been settled by the Supreme Court of the United States, and we are bound to respect it; and particularly in a case of so much delicacy as involves the political and municipal rights of other States.

There are one or two other points made by the counsel for the prisoners, which I shall barely mention and as briefly dispose of, as not necessary to the discussion of this question. One point is, that the present law is *ex post facto*. Another that the trial by jury is violated by it. These are the points made elsewhere against the late compromise. But there is nothing in them; slaves are not parties to the Constitution, and although "persons," they are property, and without immunities. These points and others may have been introduced at the hearing of this case, *ex abundantia cautela*, but it is certain that they do not affect it, and I pass them with the simple reply I have made.

As to the time at which the constitution of this State went into effect, whether at the ratification by the people, or the adoption of the State into the Union, it is not material to the issue involved; but if so, would be considered with reference to the question to be determined.

There is no such thing under the policy of our system, as a territory assuming the character of a State, without the assent of Congress. To do so, would be revolution. But the act has been passed, only to be regarded as cumulatively to explain the extent of the remedies of the 4th section, which are perfect and complete, and apply to a different class of cases than that provided for by Congress.

A fugitive slave from another State, actually escaping into this, could be removed under the act of Congress. It was, however, intended to adopt similar modes of proceeding by the 4th section, for the benefit of a different class of claimants, and to enforce a remedy against a different class of delinquents. That is all—the statute is inartificially drawn—but there is substance enough in it for all honest and faithful purposes; and to maintain the discharge of our duties to our sister States and our own Constitution. It would be but a poor evidence of our fidelity to the spirit of the compromise, to resort to a very strained and technical construction, by a surprise and strategy to deprive our American brethren of their property, because they came here in good faith, trusting to the protection of the national Constitu-

tion. This would not be the favourite mode that a wise states-
man, or a just and patriotic judge should select, to allay a long,
deep, and sorely irritated feeling, or to consign to oblivion the
unkind remembrances of the past. But a plain and truthful
administration of the law, will do this. It will mark, too, the
justice of our noble State; and if any other word was needed to
be used, I would say our wisdom.

No complaint can then go up against us, to our far off brethren,
for the want of the first; and the latter will stand out in illumi-
nated letters, declaring the truth of the law as it is, the purity
of our motives, and our devotion to our whole Union.

Already have we passed, as a great people, a fearful crisis.
With a delicate, a gentle, and a firm hand, it is our duty to
fashion our judgment so, that we uphold the law and the Consti-
tution of our country. With this, all excitement upon the sub-
ject will pass away. We shall wring no tears of humanity from
the enlightened patriot and jurist, but that these feelings of
peace to the whole Union will come back upon us.

I should not have thus expressed myself, except for the pecu-
liarity and grand importance of the question. The Judge upon
the supreme bench, from which there is no appeal, if he does
not at the time omit or forget to administer the law, may well be
excused, if under such circumstances he allows himself to feel
like a patriot. I have surveyed all the material grounds upon
which the writ of habeas corpus rests for adjudication. The
question of domicil, so far as it affects the status of slavery, has
been fully and fairly examined in all its aspects; and it will be
borne in mind, that whatever there is in the cases cited, and the
doctrine advanced, as emanating from some of the most enlight-
ened legal tribunals of the world, which bear with high autho-
rity against the claim set up by the prisoners, considered in re-
ference to our own peculiar form of national government, and
the origin of its existence, and the constitutional obligation upon
us to observe most faithfully at all times, the *comitas inter com-
munitates*, as a very delicate and last necessity, with a view to
the rights of the union of the States, may be received, on this
occasion, with augmented respect and confidence.

They furnish to us a line of action from which it will not do
to deviate. If the doctrines stated in the series of authorities

cited, be sound upon general principles affecting the status of slavery, they are much strengthened as applied to our peculiar system; and the history of California deserves a very prominent and liberal place in the consideration of this question of domicil and sojournment.

If anything were wanting to enable us to understand the true practical condition of things at the time this slave emigration took place. It was at first but the few among the many who came here for permanent residence. It was the vast and unexampled discovery of gold which brought together an excited population from every quarter of the Union.  The man of the north came with his capital in the shape of bales of goods—he of the south sometimes with his slaves.  The course of the argument now made finds equal authority and protection for both, under the broad shield of a common Constitution; and that the property of neither can be taken by a surprise, or strategy, nor without just compensation, and that both had equal rights to come to this golden and sunny land.  If in the vicissitude of extraordinary events the one shall be expelled from the land he had hoped to choose, the right is found to be preserved to him, at least, like Jacob, to depart unmolested, with all his household his goods and his chattels.

My opinion is, that the judgment of the Court should be, that the writ of habeas corpus be dismissed; that the slaves Robert Perkins, Carter Perkins, and Sandy Jones, be remanded to jail into the custody of the sheriff of the county of San Francisco, and by the said sheriff delivered to their master, or his agent.