# Joseph *v.* Randolph.

*Action for Money had and received for Plaintiff's Use.*

1. *Right of transit through the State guaranteed to citizens by constitution.*—Under constitutional provisions, both State and Federal, every

[Joseph v. Randolph.]

citizen of the United States and of the several States of the Union has, as an attribute of personal liberty, the right of free egress from, and transit through the State, unless restrained by due course of law; and this right is subject only to such legislative regulations as may be imposed by the exercise of the police power of the State, or as may remotely affect it in the legitimate exercise of the power of State taxation.

2. *Constitutionality of statutes; how determined.*—A statute is to be interpreted according to the intention of the legislature, apparent on its face, and its constitutionality must be determined by its natural and reasonable effect.

3. *Same; power of legislature to regulate constitutional right.*—No principle of construction is sounder than the common-sense and cardinal rule, that "what can not be done directly can not be done indirectly;" and hence, a constitutional right, though subject to regulation, can not be destroyed, or impaired under the device or guise of being regulated.

4. *Act of January 22, 1879 (Pamph. Acts, 1879-80, p. 205), as amended by act of December 8th, 1880 (Pamph. Acts, 1880-1, p, 162), unconstitutional.*—The act of January 22, 1879 (Pamph. Acts 1879-80, p. 205), as amended by act of December 8th, 1880 (Pamph. Acts, 1880-1, p. 162), providing that "no person, whether for himself or for other persons, shall be permitted to employ, engage, contract, or in any other way induce laborers to leave" the counties designated in the act, "for the purpose of removing said laborers from this State, without first paying to each of said counties in which such person shall operate a license tax of two hundred and fifty dollars, such license tax to be collected as other license taxes," etc., and declaring a violation of its provisions a misdemeanor, being an indirect tax upon the citizen's right of free egress from the State, and operating to hinder the exercise of his personal liberty, and to seriously impair his right to emigrate, is violative of both the State and Federal constitutions, and is void.

5. *Same; can not be sustained as a legitimate exercise of the police power of the State.*—Said act has none of the characteristics of a law designed to provide regulations promotive of domestic order, morals, health, or safety, or kindred subjects, properly falling within the purview of domestic police; and hence, it can not be sustained as a legitimate exercise of the police power of the State.

6. *Same; can not be sustained as a license tax.*—Nor can the act be sustained as a statute designed to impose a mere occupation or business tax; because, on its face, and by its terms, a license is required for the doing of a single act, and not for carrying on a business or occupation.

APPEAL from the City Court of Montgomery.

Tried before Hon. THOMAS M. ARRINGTON.

This was an action by Thomas Joseph, jr., against Francis C. Randolph, to recover $250, which the plaintiff paid to the defendant, as judge of probate of Montgomery county, for a license under the provisions of an act, entitled "An act to amend an act to require a person who employs, or in any way engages laborers in the counties of Dallas, Perry and other counties therein named, for the purpose of removing said laborers from the State, to pay a license tax, approved January 22, 1879." This amendatory act was approved December 8th, 1880.—Pamph. Acts, 1880-1, p. 162. The complaint sets out at length the facts on which the recovery is claimed, showing a payment under protest, and after the defendant's arrest for a

[Joseph v. Randolph.]

violation of the provisions of the act; but, in as much as the only question discussed by counsel, or considered by the court, is the constitutionality of the act under which the payment was made, it is unnecessary to state more fully the averments of the complaint. The defendant interposed a demurrer to the complaint, which was sustained by the City Court; and the plaintiff declining to amend, judgment final on the demurrer was rendered for the defendant.

The ruling of the court on the demurrer is here assigned as error.

THOS. G. JONES, and J. M. FALKNER, for appellant.—(1) The tax, which is called a license, is not a tax or license on the *occupation* or *business*. An act (p. 255, Acts 1876–7) approved January 30th, 1876, had already imposed such tax. The later act is aimed at the *act of hiring*, with a view to removal abroad. There is no doubt of this when the two acts are taken together. The test is the ordinary and practical *result of the statute.—Henderson v. Mayor*, 92 U. S. 268. (2) This is a vicious species of class legislation. A man's right to labor for subsistence is a natural right, and amply protected by the Declaration of Rights. The right to make a contract to labor, is essential to the right to labor; and the constitution expressly recognizes the right to labor where one pleases, in giving the right to go where one pleases.—Declaration of Rights, § 37. It takes *two* to make a contract. The burden of $250 on one party's right to contract, necessarily operates on the contract itself. The State in this case charges as much for the right to make the contract as any unskilled laborer can earn in a year. Its inevitable effect is to tax the right to contract out of existence. The legislature can only regulate, it can not *destroy* a right given by the constitution or protected by it, and can not accomplish by indirection what it can not do directly.—*Railroad Co. v. Morris*, 65 Ala. 200. A license for sale of goods, is in effect a tax on the goods themselves.— *Welton v. Missouri*, 91 U. S. 275. So a license on the sale of *labor*, is a tax on the laborer himself.—*Almy v. California*, 24 Howard, 173; 12 Ala. 178; 92 U. S. 270. This act singles out laborers alone, of all other persons in the State, who contract to render services, and puts an iniquitous burden on them, when the rest of the people of the State, similarly situated, are left entirely free. There is neither necessity, reason nor justice in the imposition. It can not be justified as the exercise of *police* power, since the act does not contain a single regulation looking to the peace, morals, welfare or safety of either the community or of the emigrants. It is a naked attempt to tax a constitutional right out of existence.—*Ling Sing v. Wash-*

*burn*, 20 California, 579. If the legislature may put this burden on the laborer for the mere making of a contract for his labor, it may do it as to all who furnish him food, raiment or shelter, and in the end degrade and outlaw him. Under the constitution, and the framework of our government, all must be equal in the exercise of *fundamental* constitutional rights. If a class can be regulated differently from the rest of the community, there must be a *necessity*, a *reason*, to justify it. Cooley Con. Lim. § 393; *Ex Parte Dorsey*, 7 Porter, 361. The only test for determining who constitute *the class* upon all of whom this special law must operate to be constitutional, is whether the individual rights and duties, in connection with the subject-matter, regardless of the name or classification given, fairly bring them within the reasons which justify the passage of the law. If it were otherwise, there would be no limit to the power to oppress by class legislation; and there might be as many classes and, consequent class distinctions, as the legislative vocabulary could find terms in which to name them. Rights and privileges can not be allowed certain individuals, and denied to others similarly situated, merely because the legislature chooses to classify them by different names. The nature of the act forbidden or permitted; its subject-matter; its legal quality; the consequences and persons' connection therewith, must fix and determine the *class* which may be governed by special law, different from that applicable to the community at large. The legislature can not discriminate between persons, simply by calling them by different names. *Railroad Co. v. Morris*, 65 Ala. 200; *Wally v. Kennedy*, 2 Yerger, 554; *Holden v James*, 11 Mass. 396; 12 Bush. (Ky.) 110; 1 Curtis, 327. The fundamental rights of an Alabamian, no valid *police* regulation being attempted, must be the same in every county; otherwise rights and privileges of citizenship would be determined by counties. The legislature might as well attempt to declare that any person who contracted with a *laborer* to educate his ·child in *Montgomery county*, should be taxed fifty dollars, and no tax should be required for contracting to do the same service for him in *Madison* county, as to uphold this act. (3) This act impairs the right of the citizen to *emigrate*. Contracts to labor in another State are the ordinary and usual modes for a laborer's obtaining means to move.—Code, §§ 1750-1755. The tax is a prohibition. It prevents advances to enable him to leave, on the faith of his promise to labor in his new home. Its purpose is to make the laborer a mere thing—a fixture to the soil. It is in the very teeth of the Declaration of Rights, § 31. An Alabamian is thereby a citizen of the United States, and, as such citizen, can not be taxed for moving from one State into another.—16 Wal-

[Joseph v. Randolph.]

lace, 80; *Crandall v. Nevada*, 6 Wallace, 36; *Ward v. Maryland*, 12 Wallace, 430.   It is established that no State can put a tax upon a carrier, because he transports freight from one State into another.—15 Wallace, 279.   Hence, it can not tax the transporter for making such a contract, and a contract to emigrate is as fully protected as a contract to transport.   The State can not interfere with it in this way.—*Brown v. Maryland*, 4 Wheaton, 419; *Crandall v. Nevada*, 6 Wallace, 36; 91 U. S. 275.   (4) The statute is also a violation of the XIV Amendment of the Constitution of the United States.   This point elaborately discussed, and the following cases cited in support thereof: *Baker v. Portland*, 5 Saw. 566; *State v. Claiborne*, 1 Meigs (Tenn.) 337; *Ah Kow, v. Nunan*, 5 Saw. 562; *Re Ah Fong*, 3 Saw. 156; *Welton v. Missouri*, 91 U. S. 275.

SHAVER & HUTCHESON, *contra.*—(1) "The burden of proof is on him who asserts the unconstitutionality of a statute; and, unless it is clear that the legislature has transcended its authority, the courts will not interfere."—*Sadler v. Langham*, 34 Ala. 311.   (2) It is settled in this State that there are no limits to the legislative power of the General Assembly, save such as are imposed by the State or Federal constitutions. *Dorman v. The State*, 34 Ala. 216.   (3) It is claimed that the act under consideration "*impairs* the right of the citizen to emigrate."   If this be true, then every regulation of a constitutional right is an impairment of it.   The inhibition is against a *prohibition* of the right, and not against a *regulation* thereof. To *regulate* is not to *prohibit;* and the right to regulate the exercise of a right is universally conceded.   (4) The act is not class legislation.   It does not *directly* affect the laborer; and its operation upon the right of the laborer to hire or make contracts is merely *remote* and *indirect.*—See *City of New York v. Miln*, 11 Peters, 102; *Slaughter House Cases*, 16 Wall. p. 63.   And the act is public in its object.   Such laws may, unless express constitutional provision forbids, be either general or local in their application, and may embrace one or many subjects, and may extend to all citizens, or be confined to particular classes.—Cooley's Cons. Lim. (4th Ed.) pp. 488-9. (5) The counties embraced in the act are dependent for the most part on agriculture.   About the time the act in question was passed, as this court will judicially know, what was known as the "Kansas Exodus" movement was going on among the agricultural laborers of this section; and, in addition to this, then and ever since, contractors on numerous railroads, in process of construction out of the State, were and have been engaged in hiring such laborers in those counties mentioned in the act, and taking them off plantations and from other indus-

[Joseph v. Randolph.]

tries, and carrying them out of the State, thus endangering the farming interests. This is the *reason* of, and hence arose the *necessity* for the statute. As to whether there exists a reason or public necessity for a law, the legislature is the sole and exclusive judge.—*Dorman v. State*, 34 Ala. 235; *Mayor v. Yuille*, 3 Ala. 143; Cooley on Cons. Lim., p. 129. (6) The act is a legitimate exercise of the police power of the State. Following authorities cited and discussed on this point: *Thorpe v. R. & B. R. R. Co.*, 27 Vt. 149; 2 Kent's Com. 340; *Passenger Cases*, 7 How. 283; *Re Ah Fong*, 3 Saw. 154; Code of 1876, § 4325. (7) The act is not violative of the XIV Amendment or any other provisions of the constitution of the United States. Following cases cited and discussed *in arguendo:* Cooley's Con. Lim. p. 715; *License Cases*, 5 How. 504; *Passenger Cases*, 7 How. 283; *Slaughter House Cases*, 16 Wall. 36; *License Tax Cases*, 5 Wall. 471; *Crandall v. Nevada*, 6 Wall. 35. (8) The power of the State to tax, control, or regulate any business carried on within its boundaries, is recognized by the acts of Congress, and sustained by all the authorities.—*License Tax Cases*, 5 Wall. 462.

SOMERVILLE, J.—The question presented for decision is a constitutional one, involving the validity of an act of the General Assembly of this State, entitled "An Act to require a person who employs, or in any way engages laborers in the counties of Dallas, Perry," and other counties therein named, *"for the purpose of removing said laborers from the State,* to pay a license tax;" which act, as originally approved on January 22, 1879, designated the amount of such license at one hundred dollars.—Acts 1878-9, p. 205. It was amended December 8, 1880, so as to increase this license to *two hundred and fifty dollars.*—Acts 1880-81, p. 162.

It provides that "no person, whether *for himself or for other persons,* shall be *permitted to employ, engage, contract, or in any other way induce laborers to leave the counties* of Dallas, Perry, . . Montgomery . . for *the purpose of removing said laborers from this State,* without first paying to each of said counties in which such person shall so operate a license tax of two hundred and fifty dollars, such license tax to be collected as other license taxes," etc.

It is insisted, among other things, that the plain intent and natural effect of this statute is to tax, by indirection, the constitutional right of the citizen to have free egress, at all seasonable times, by emigration from the State. If this view be correct, it is clear that the validity of the act can not be sustained.

There can be no denial of the general proposition that every

[Joseph v. Randolph.]

citizen of the United States, and every citizen of each State of the Union, as an attribute of personal liberty, has the right, ordinarily, of free transit from, or through the territory of any. State. This freedom of egress or ingress is guaranteed to all by the clearest implications of the Federal, as well as of the State constitution. It has been said that even in England, whence our system of jurisprudence was derived, the right to personal liberty did not depend on any express statute, but "it was the birthright of every freeman."—Cooley's Const. Lim. 342. This right was said by Sir William Blackstone to consist in "the power of locomotion, of changing situation, or of moving one's person to whatsoever place one's inclination may direct, without imprisonment or restraint, unless by due process of law."—1 Bl. Com. 134. For its summary vindication, when illegally molested, the writ of *habeas corpus* had its origin, and was established with *magna charta.*—Hurd on Habeas Corpus, 143.

This liberty of inter-state transit, thus based on the assertion of personal liberty, is referable to many clauses of the Federal constitution. In *Ward v. Maryland,* 12 Wall. 418, 430, it was classed by Mr. Justice CLIFFORD as one of "the *privileges* and *immunities* of the citizens of the several States," guaranteed to the citizens of each State by Art. IV., Sec. 2 of the constitution of the United States. In the *Passenger Cases,* 7 How. (U. S.) 283, it was recognized by a majority of the Supreme Court of the United States as a right protected by the commercial clause of the Federal constitution from hostile State legislation, and its existence was admitted by all, and denied by none. Mr. Justice WAYNE said that no State had the right "to tax a foreigner or person for coming into one of the United States." "That," he continued, "would be a tax or revenue act, in the nature of a regulation of commerce acting upon navigation," and as such he thought it violative of the Federal constitution.—*Passenger Cases, supra,* 420. In *Crandall v. State of Nevada,* 6 Wall. 35, the entire court concurred in the view, that a capitation tax of one dollar, imposed by the legislature of Nevada upon every person leaving the State, as a passenger by railroad, stage-coach or other mode of conveyance, was unconstitutional and void. The reason was, that it infringed the unquestionable right of every citizen to have free ingress and egress, *to* and *from* and *through* the States and Territories composing a common general government—a right fully recognized by all the judges as having an undoubted existence, although they differed as to the particular ground upon which it could be rested.—Rorer on Inter-State Law, 315.

Our present State constitution contains an obvious recognition of the right under discussion in the declaration, that "*emi-*

[Joseph v. Randolph.]

*gration* shall not be prohibited," and in the fundamental maxim that "all men are endowed by their Creator with certain inalienable· rights, among which are "*life, liberty* and *the pursuit of happiness.*"—Const. 1875, Decl. Rights, §§ 1, 31.

The right of every citizen, or person to enjoy free egress from, or transit through the State, is, in our opinion, an undoubted constitutional right. The framers of the Federal constitution clearly intended that personal intercourse between the States should be, so far as practicable, as free as the transit of the ocean, and as unembarrassed as the commerce of the public seas. It must, therefore, remain unfettered and free, subject only to such legislative regulation as may· be imposed by the exercise of the *police power* of the States, or as it may be remotely affected by the legitimate exercise of the power of *State taxation.* Let us examine this act, so as to test it in the light of these two considerations.

A· legislative act is to, be interpreted according to the intention of the legislature apparent on its face. So the purpose and constitutionality of a statute, in whatever language it may be framed, "must be determined by *its natural and reasonable effect.*"—*Henderson v. Mayor, &c., New York,* 92 U. S. 259; *Chy Lung. v. Freeman, Ib.* 275.

Construing the statute now under consideration according to this rule, it can scarcely be sustained as an exercise. of the police power of the State. This power is generally said to extend to making regulations promotive of domestic order, morals, health and safety, having its just foundation in the public right of self-defense, and its origin in the maxim, *Sic utere tuo ut alienum non lædas.*—*Thorpe v. The Rutland, &c., R. R. Co.,* 27 Vt. 149; *The Amer. Union Tel. Co. v. The Western Union Tel. Co.,* 67 Ala. 26. This act has none of the characteristics of a law designed to *regulate* these or kindred subjects, which properly fall within the purview of domestic police. *There can be nothing so injurious or offensive in the act of hiring a single. unemployed laborer, for one's service, as to require police regulation by the State.*

Nor, very manifestly, is this statute designed to impose a mere *occupation or business tax,* which is always done either for purposes of revenue, or of police regulation.—Cooley's Const. Lim. 596, (5th Ed.) p. 743. Under the general law, licenses are required only of such persons as engage in and carry on the *business* of certain vocations, professions and employments. Code, 1876, § 490. Single acts are not licensed, but only a series of acts prosecuted with the intention of "reaping a profit or making a livelihood."—*Harris' case,* 50 Ala. 127; *Weil's case,* 52 Ala. 19. Besides, an act for this purpose was manifestly fruitless, as one already existed, imposing a license tax

[Joseph v. Randolph.]

of one hundred dollars upon all persons undertaking "to act as an emigration agent," in the county of Montgomery, and other counties designated, which had been in force about two years when the statute in question was enacted.—Acts 1876-7, p. 225. If we could see that the legislative purpose was merely to impose a license tax upon persons engaged in the business or occupation of hiring persons to leave the State, we would not be justified in declaring the law violative of the constitution, because it *incidentally* affected the right of free egress from the State. A constitutional right is often affected in this way by the taxing power, without a repugnancy which will vitiate the tax. In *Osborne v. Mobile*, 16 Wall. 479, it was accordingly held that an annual license tax imposed by the city of Mobile on an express company, engaged in that city in carrying on an inter-state commerce, was not repugnant to the constitution as a regulation of commerce. So a tax imposed by the legislature of Pennsylvania upon the gross receipts of railroad and canal companies, doing business between that and other States, has been sustained as a proper exercise of the taxing power.—*State Tax on Railway Gross Receipts Case*, 15 Wall. 284.

A constitutional right, however, conferred by the Federal constitution, as such, can not be taxed by the States, either directly or indirectly, because the power to tax carries with it the power to defeat and render useless, if not to destroy. *Pollard v. State*, 65 Ala. 628; *McCullough v. Maryland*, 6 Wheat. 316. A law, as we have seen, would certainly be void which exacted tribute of a citizen as the price of crossing a State line. Does the license in question operate manifestly as a tax, by indirection, upon the right of the citizen to leave the State, or does it so burden this right as to effectually impair it? No principle of construction is sounder than the common sense and cardinal rule, that "what can not be done directly can not be done indirectly."—*Ex Parte Hardy*, 68 Ala. 303; *Cummings v. Missouri*, 4 Wall. 277. If the law should act upon any other theory, it would subject itself to the just challenge of catching *at shadows and not substances*. Hence, a constitutional right, though subject to regulation, "can not be impaired, or destroyed, under the device or guise of being regulated."—*South & North Ala. R. R. Co. v. Morris*, 65 Ala. 193.

It is easy to see the application of this principle in construing the statute now under review. Every person, including every laborer, has the right of egress from the State—the right to emigrate at his option, and in the unobstructed exercise of his free will. He has, therefore, the clear right to contract to exercise such right, because it may become a necessary and

[Joseph v. Randolph.]

only means of its successful exercise. If the right itself exists and is lawful, it can not become unlawful to agree to exercise it.

It may be said, however, that no license is required of the laborer to contract, but *only of any one else to contract with him.* The fallacy of the suggestion is patent, as it requires at least *two parties* to every contract. A law forbidding the *purchase* of any commodity is in effect a law to prohibit its *sale.* In *Brown v. Maryland*, 12 Wheat. 419, it was said that a tax on the sale of an article, imported for sale, was a tax on the article itself. So it was decided in *Welton v. State of Missouri*, 91 U. S. 275, that a license tax required for the sale of goods was, in effect, a tax on the goods themselves. The license in that case was sought to be sustained as a tax upon a calling or occupation. In like manner a tax upon passenger carriers of a specific sum for each passenger transported has been adjudged to be a tax upon the passengers.—*Passenger Cases*, 7 How. (U. S.) 283; *Crandall v. Nevada*, 6 Wall. 35.

The legislative intent then is plain upon the face of the act. Its purpose is to prevent free egress of laborers, from the counties designated, out of the State. There is no tax upon the right of hiring or inducing them to go elsewhere. But a tax of two hundred and fifty dollars, in the form of a license, is exacted of every one who makes a contract with a laborer, or otherwise offers him an inducement to leave the State, whether for the service of the particular employer or hirer, or for that of other persons. The license required might thus amount to twice or three times the annual value of the hireling's labor. It requires no great draft upon judicial knowledge to declare that such a tax *is in its nature prohibitory*, and its natural effect, pursuant to its obvious purpose, is to seriously clog and impair the laborer's right of free emigration.—*Ex Parte Burnett*, 30 Ala. 461.

Construing the act under consideration by the test of these principles, we do not see how it can be sustained. It must be pronounced void as an indirect tax upon the citizen's right of free egress from the State, operating to hinder the exercise of his personal liberty, and seriously impair his freedom of emigration.—*Webber v. Virginia*, 103 U. S. 344; *Vines v. State*, 67 Ala. 73; *Passenger Cases, supra.*

There are other objections urged to this act besides the one we have above considered. It is ably assailed as a species of vicious *class legislation*, applicable alone to *laborers* and to no other persons in the community. It is also attacked as being repugnant to the Fourteenth Amendment of the Federal Constitution, the ground of objection being that it is a denial by the State to laborers, as a class, of "the *equal protection* of the laws." What force there may be in these objections we need

[Seals v. Edmondson.]

not consider, as. it is rendered entirely unnecessary in view of the conclusion to which we have come, pronouncing the law void for other and distinct reasons.

The judgment of the City Court is reversed, and the cause remanded for further proceedings in accordance with the views expressed in this opinion.