## UNITED STATES v. CHUNG SHEE.

### (District Court, S. D. California. December 2, 1895.)

1. DECISION ON HABEAS CORPUS—CONCLUSIVENESS.
   A judgment of a federal court discharging on habeas corpus a Chinese immigrant from detention on board the vessel and permitting her to land is conclusive as to her right to come into the country.

2. EXCLUSION OF IMMIGRANT—DECISION OF COLLECTOR.
   The decision of a collector denying an alien admission into the country is final unless reversed on appeal to the secretary of the treasury.

3. HABEAS CORPUS—RIGHT TO WRIT.
   An immigrant held in custody on board a vessel by the master under directions from the customs authorities is "in custody under or by color of the authority of the United States," within the meaning of Rev. St. § 753, authorizing the issuance of a writ of habeas corpus in such a case.

4. SAME—CHINESE IMMIGRANTS.
   The jurisdiction of the federal courts to issue the writ in such a case is not taken away by the Chinese restriction act.

5. JUDGMENT—COLLATERAL ATTACK.
   A judgment is not open to collateral attack because based on a fraudulent instrument or perjured testimony.

George J. Denis, U. S. Atty.

Marble & Phibbs, for defendant.

WELLBORN, District Judge. This is an appeal from an order of deportation made by United States Commissioner Van Dyke. The affidavit on which the warrant of arrest was issued by said commissioner charges that on the 16th of June, 1893, "one Chung Shee (a Chinese woman) did come into the United States from a foreign place, and, having come, has remained within the United States; that the said Chung Shee has been found and now is unlawfully within the United States; and that at all the times herein mentioned the said Chung Shee was and is a Chinese laborer," etc.

The evidence adduced upon the trial before me establishes the following facts:

First. The defendant is a woman, 20 years of age, and a subject of the emperor of China.

Second. About June, 1893, the defendant, under the name of Chung Shee, arrived at the port of San Francisco, Cal., on the steamer Peru, from China, and sought admission to the United States on the ground that she was the wife of a Chinese merchant then living in said city of San Francisco, and so testified upon the proceedings below and in this paragraph mentioned. After an examination by the collector at that port, she was refused permission to land. A writ of habeas corpus was subsequently, on July 21, 1893, issued by Judge Morrow.

On the 31st of the same month a report was filed in the case by a special referee, recommending that the prisoner be remanded. On the 1st of August, 1893, an order, by Judge Hawley, was made, directing the return of Chung Shee to the steamship Peru, to be hence taken to Hong Kong, China. On the 10th of August, 1893, at San Francisco, the United States marshal made upon said order the following return: "I hereby certify that I executed the within order on the 10th day of August, 1893, by placing the within-named Chung Shee on board the steamship Rio De Janeiro, bound for the port of Hong Kong." With reference to the identity of Chung Shee and this defendant, there has been some conflict of testimony, but I am satisfied, that the defendant is the person who, under the name of Chung Shee, sought and was denied landing at San Francisco, as testified to by the witnesses for the government.

Third. On January 30, 1894, a petition for habeas corpus was presented to the Honorable C. B. Bellinger, United States district judge for the district of Oregon, by the defendant, under the name of Lum Lin Ying, alleging:

"That the facts concerning the detention of your petitioner are that T. J. Black is collector of customs of the United States for the district of Oregon. That the Signal is a steamship plying between the port of Victoria, in British Columbia, and the port of Portland, in the United States. That the said ship the Signal is now under the control and in the possession of said T. J. Black as such collector. That your petitioner is the wife of a Chinese merchant by the name of Chung Chew, who is a Chinese merchant, as aforesaid, doing business in the general merchandise business at No. 64 Second street, in said city of Portland, Oregon; and he is not a Chinese laborer. That said Chung Chew has been for more than three years last past lawfully in the United States, engaged in his said business as such merchant, and has the right, under the laws of the United States and of the treaty with the empire of China and the United States, to remain in the United States. That said Lum Lin Ying, being desirous of joining her husband, Chung Chew, in the United States, came to the United States as a passenger on board the said steamer Signal. That Pendergast, the master of said steamship Signal, acting upon the decision of said T. J. Black that said Lum Lin Ying had no right to land in the United States, declined and refused, and still declines and refuses, to permit your petitioner to land in the United States from said steamship Signal, but restrains her of her liberty on board said ship. That on the 30th day of January, 1894, said T. J. Black had a hearing before him in regard to the right of your petitioner to land in the United States, and then and there decided that your petitioner had no right to land, and rejected her claim that she had such right, and upon said decision said Pendergast refused and refuses to allow your petitioner to land, as above set forth."

On this petition the writ therein applied for was issued, and on the 2d of February the judgment of the court was duly rendered, discharging the petitioner from the detention and restraint complained of in said petition, and thereupon she was permitted to land. The opinion of Judge Bellinger is reported in 59 Fed. 682. Chung Chew, the alleged husband of the defendant, was at the time a merchant, residing at Portland, Or. For four or five months thereafter, Chung Chew and the defendant lived together as husband and wife in said city, when they moved to Los Angeles, Cal., where they resided up to the time of Chung Chew's death, which occurred about the latter part of October, 1894. Since the date last named, the de-

fendant, claiming to be the widow of Chung Chew, has continuously resided in Los Angeles.

My opinion is that the judgment of the district court of Oregon is conclusive of the present case. On this subject the rule of law is thus stated by an eminent text writer:

"The writ of habeas corpus may be resorted to (1) by or on behalf of some person who is imprisoned or otherwise deprived of his liberty; or (2) on behalf of some person. * * * In cases of the first class it is well settled that the remanding to custody of the person claimed to be illegally imprisoned is not a decision to which the principle of res adjudicata is applied. A party may apply successively to every court having jurisdiction to grant the writ for his discharge, until he exhausts the entire judicial authority of the state. * * * If, on the other hand, the prisoner is discharged from custody, this is an adjudication that at that time he was entitled to his liberty, and is conclusive in his favor, should he be again arrested, unless some authority can be shown for holding him, which did not exist at the time of his discharge." 1 Freem. Judgm. § 324.

Again, it has been held that in proceedings upon habeas corpus the determination of the court upon the facts has the effect of a verdict of a jury. Bonnett v. Bonnett, 61 Iowa, 199, 16 N. W. 91. Indeed, the authorities without exception seem to hold that when a person has been discharged upon habeas corpus the issues of law and fact involved are res adjudicata, and the person so discharged cannot, for the same cause, be again lawfully arrested. Church, Hab. Corp. § 386; Ex parte Jilz, 64 Mo. 205; In re Crow, 60 Wis. 349, 19 N. W. 713; Yates' Case, 6 Johns. 337. On this point the government contends that "in the federal courts the doctrine of res judicata is not applicable to a decision in a habeas corpus proceeding," and cites as authorities Ex parte Kaine, 3 Blatchf. 5, Fed. Cas. No. 7,597, and Ex parte Cuddy, 40 Fed. 65. These cases, however, so far from sustaining, are against, the government's contention. In the first the court, after declaring that in proceedings upon a writ of habeas corpus the federal courts follow, not the laws and regulations of the states, but the common law of England, proceeds thus:

"That, according to that system of laws, so guarded is it in favor of the liberty of the subject, the decision of one court or magistrate upon the return to the writ, refusing to discharge the prisoner, is no bar to the issuing of a second or third or more writs by any other court or magistrate having jurisdiction of the case."

Thus it will be seen from this opinion that it is only where the prisoner is remanded that the decision of the court is not final. The same may be said of Ex parte Cuddy, supra. From the opinion of Justice Field in this last case the following quotation is made in the government's brief:

"The doctrine of res judicata was not held applicable to a decision of one court or justice thereof; the entire judicial power of the country could thus be exhausted."

The latter part of this quotation would be meaningless, except upon the idea that Justice Field was discussing a case wherein the prisoner was remanded. The same is true of the opinion of the court in Re Perkins, 2 Cal. 430, cited in the government's brief. While, therefore, these decisions do not expressly so hold, the implication

from them is unavoidable that where, on a writ of habeas corpus, the prisoner is discharged, the decision is a final determination in his or her favor.

The further argument of the government in this connection is (page 5 of its brief) that the decision of a collector denying an alien admission into this country is similar to an order, upon preliminary examination, discharging or committing a person accused of crime. With this argument I cannot agree. The order of a committing magistrate does not purport to determine the question of innocency or guilt, and therefore the discharge of the accused, whether at the preliminary examination or a review upon habeas corpus, does not, of course, bar subsequent inquiry, indictment, or trial. It was to this situation that the supreme court of South Carolina referred in the case of State v. Fley, 2 Brev. 338, in the quotation made at page 6 in the government's brief, where the court declare that it would be monstrous to say that the discharge of a prisoner upon habeas corpus shielded him from subsequent prosecution. The determination, however, of an alien's claim to enter the United States is wholly different. When the power and duty of so determining are committed to any officer, no matter whether such officer belongs to the executive or judicial branch of the government, the decision of such officer is an adjudication of the right involved, namely, the right of the alien to enter the country, and such adjudication is final, unless the law expressly or impliedly provides for an appeal from or review of the decision. And this is the doctrine of the case which the government invokes to the support of its argument. In re Day, 27 Fed. 678. In that case, the court says:

"The provisions above quoted manifestly impose upon the commissioners the duty of determining the facts upon which the refusal of the right to land depends. The general doctrine of the law in such cases is that, where the determination of the facts is lodged in a particular officer or tribunal, the decision of that officer or tribunal is conclusive, and cannot be reviewed, except as authorized by law."

The court then proceeds to hold that the act of August 3, 1882, does not authorize any review, by habeas corpus or otherwise, and that the decision of the commissioners is final and conclusive. This case, therefore, so far from upholding, is directly against, the government's contention on the point in question. I would say here, in passing, that, under the Chinese exclusion acts, I think the decision of the collector of customs is not final, but that the truth of the matter may be determined on habeas corpus, or in a proceeding against such persons for being unlawfully in the country. U. S. v. Loo Way, 68 Fed. 475. This rule, however, has been so changed by a subsequent act of congress that now the decision of the collector of customs, if adverse to the alien, is final, unless reversed on appeal by the secretary of the treasury. 28 Stat. 390.

In opposition to the conclusiveness of the Oregon judgment in favor of the defendant the government further contends that the refusal of our government to allow aliens to enter or remain in this country is an exercise of political power, and therefore the doctrine of res judicata does not apply to the determinations of any of the

officers or tribunals under and pursuant to exclusion acts of congress. This contention does not seem to me to be well founded. While it is true that the exclusion of foreigners is an exercise of political sovereignty, yet, where a general law has been passed for that purpose, the application of such law to individual cases is essentially a judicial function, and I can see no reason why the principle of res judicata should not be applied. Indeed, that the principle does apply to such cases is the sole question decided in the Day Case, supra. There the court dismissed a writ of habeas corpus on the ground that the decision of the commissioners refusing to allow certain foreigners to come into the country was final, and that the matter could not be made the subject of any subsequent inquiry. By reference to the decision in that case, it will be seen that a large number of authorities are cited in its support.

The further argument of the government that the Oregon judgment does not cover the issues involved in this proceeding seems to me equally untenable. Whatever may have been the reasoning of Judge Bellinger in his opinion, the judgment of the court upon the petition for the writ of habeas corpus, as found in the transcript of the record in evidence, was as follows:

"This cause was heard upon the petition and the testimony, the petitioner appearing by Mr. B. B. Beckman and Mr. G. W. P. Joseph, of counsel, and the United States, intervening herein, by Mr. Daniel R. Murphy, United States attorney; and, the court being now fully advised in the premises, it is ordered and adjudged that the prayer of said petition be granted, and that said petitioner be, and she is hereby, discharged from the detention and restraint complained of in said petition."

The precise question passed upon by Judge Bellinger was the right of the defendant to enter and remain in the United States, and he unquestionably had jurisdiction to hear and determine the matter. This point has been expressly decided by the supreme court of the United States. Judge Blatchford, delivering the opinion, says:

"It is contended for the United States that there was no jurisdiction in the district court to issue the writ in the first instance, because the party was not restrained of his liberty, within the meaning of the habeas corpus statute. It is urged that the only restraint of the party was that he was not permitted to enter the United States. But we are of opinion that the case was a proper one for the issuing of the writ. The party was in the custody. The return of the master was that he held him in custody by direction of the custom authorities of the port, under the provisions of the Chinese restriction act. That was an act of congress. He was, therefore, in custody under or by color of the authority of the United States, within the meaning of section 753 of the Revised Statutes. He was so held in custody on board of a vessel within the city and county of San Francisco. The case was one falling within the provisions of chapter 13 of title 13 of the Revised Statutes. It is also urged that if the right to issue the writ existed otherwise under the general provisions of the Revised Statutes, that right was taken away by the Chinese restriction act, which regulated the entire subject-matter, and was necessarily exclusive. * * * We see nothing in these acts which in any manner affects the jurisdiction of the courts of the United States to issue a writ of habeas corpus. On the contrary, the implication of section 12 is strongly in favor of the view that the jurisdiction of the courts of the United States in the premises was not intended to be interfered with. That section provides that 'any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came * * * after be-

ing brought before some justice, judge, or commissioner of the United States and found to be one not lawfully entitled to be or remain in the United States.' So that, if it were to be claimed by the United States that Jung Ah Lung, if at any time he should be found here, was found unlawfully here, he could not be removed to the country from whence he came, unless he were brought before some justice, judge, or commissioner of a court of the United States, and were judicially found to be a person not lawfully enti- tled to be or remain here. This being so, the question of his title to be here can certainly be adjudicated by the proper court of the United States, upon the question of his being allowed to land." U. S. v. Jung Ah Lung, 124 U. S. 621, 8 Sup. Ct. 663.

Just such an adjudication as that here described was had in the case of the defendant at Portland, Or., upon the writ of habeas corpus already mentioned. Defendant's "title to be here" was then "ad- judicated by the proper court of the United States," and "upon the question of her being allowed to land." The government, however, insists that the Oregon judgment was obtained through fraud, and is, therefore, open to collateral attack, and cites to this point, among other cases, U. S. v. Throckmorton, 98 U. S. 61–67. I cannot so find or hold. If fraud was practiced upon the court, it consisted wholly in the introduction of false testimony, and it is well settled that this is no ground for vacating a judgment. Such was the express hold- ing of the court in U. S. v. Throckmorton, supra. Mr. Justice Miller, delivering the opinion of the court, says:

"Where the unsuccessful party has been prevented from exhibiting fully his case by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without author- ity assumes to represent a party, and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing. See, Wells, Res Adj. § 499; Pearce v. Olney, 20 Conn. 544; Wierich v. De Zoya, 2 Gilman, 385; Kent v. Ricards, 3 Md. Ch. 396; Smith v. Lowry, 1 Johns. Ch. 320; De Louis v. Meek, 2 G. Greene, 55. In all these cases, and many others which have been examined, relief has been granted on the ground that, by some fraud practiced directly upon the party seeking relief against the judgment or decree, that party has been prevented from presenting all of his case to the court. On the other hand, the doctrine is equally well settled that the court will not set aside a judgment because it was founded on a fraudu- lent instrument, or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed. Mr. Wells, in his very useful work on Res Adjudicata, says (section 499): 'Fraud vitiates every- thing, and a judgment equally with a contract,—that is, a judgment ob- tained directly by fraud, and not merely a judgment founded on a fraudu- lent instrument; for, in general, the court will not go again into the merits of an action for the purpose of detecting and annulling the fraud.  *  *  * The maxim that fraud vitiates every proceeding must be taken, like other general maxims, to apply to cases where proof of fraud is admissible. But where the same matter has been actually tried, or so in issue that it might have been tried, it is not again admissible. The party is estopped to set up such fraud, because the judgment is the highest evidence, and cannot be contradicted.  *  *  *' We think these decisions establish the doctrine on which we decide the present case, namely: That the acts for which a court of equity will, on account of fraud, set aside or annul a judgment or decree between the same parties, rendered by a court of competent jurisdiction,

have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered. That the mischief of retrying every case in which the judgment or decree, rendered on false testimony given by perjured witnesses, or on contracts or documents whose genuineness or validity was in issue, and which are afterwards ascertained to be forged or fraudulent, would be greater by reason of the endless nature of the strife than any compensation arising from doing justice in individual cases."

Recognizing and applying the principle enunciated in the foregoing extracts from U. S. v. Throckmorton, supra, I cannot do otherwise than hold that no such fraud has been shown in the present case as invalidates the judgment of the Oregon court. Whether that court was misled by false testimony, or erred in its conclusions of law, are questions not here open to inquiry. It is to be presumed, in favor of its judgment, that the evidence required by law as to the right of the defendant to come into the United States was adduced upon the hearing. That judgment cannot be collaterally assailed in this proceeding, and must be held to establish the lawfulness of the defendant's residence in the United States. This ruling renders it unnecessary to decide the other points submitted in defendant's brief.

The judgment and order of the commissioner will be reversed, and the defendant discharged.