Ex parte REAVES.

(Circuit Court, M. D. Alabama. February 16, 1903.)

1. NAVY—ENLISTMENT OF MINORS WITHOUT PARENTS' CONSENT—RIGHTS OF PARENT.

Rev. St. § 1419, as amended by Act May 12, 1879, c. 5, 21 Stat. 3, and Act Feb. 23, 1881, c. 73, § 2, 21 Stat. 338 [U. S. Comp. St. 1901, p. 1007], which provides that "minors between the age of fourteen and eighteen years shall not be enlisted for the naval service without the consent of their parents or guardians," declares a public policy, and the enlistment of a minor under the age of 18 without the consent of his father is void from the beginning as against the father, and gives the minor no status in the naval service which can be asserted by the United States to deprive the father of the custody and control of his son after he has re-gained the same, or which renders the son punishable by court-martial for desertion in peaceably leaving his ship and returning to his father with the latter's approval.

2. SAME—RIGHT TO MINOR'S CUSTODY—HABEAS CORPUS.

In such case, where the minor has been taken from the lawful custody of his father, to which he had returned, by the naval authorities on the charge of desertion, the writ of habeas corpus is the proper proceeding to determine his status and the right to his custody, the validity of the enlistment, as against the father, being a matter which the civil courts alone have jurisdiction to determine; and a judgment awarding him to the custody of his father is conclusive upon the government, and fixes the status of the prisoner as that of a civilian not amenable to military law.

3. SAME—CONSTRUCTION OF STATUTE.

Act March 3, 1893, c. 212, 27 Stat. 715 [U. S. Comp. St. 1901, p. 1006], which makes a fraudulent enlistment and the receipt of any pay or allowance thereunder an offense against naval discipline punishable by court martial, does not give a minor under the age of 18, who is enlisted without the consent of his parent, in violation of Rev. St. § 1419 [U. S. Comp. St. 1901, p. 1007], a naval status which defeats the right of his parent to avoid the enlistment, because the minor has received pay or allowances without the parent's knowledge, since the drawing of allowances is the immediate and inevitable effect of every enlistment, and such a construction of the act would be to nullify the prohibition of such enlistments.

Habeas Corpus.

Petition for habeas corpus by P. A. Reaves to regain the custody of his minor son, who was held by the chief of police of the city of Montgomery, Ala., on the charge of being a deserter from the navy. The minor, who resided in the city of Montgomery, Ala., with his father, left home and went to Meridian, Miss., where he enlisted in the navy. He was then, and still is,

---

¶ 1. See Army and Navy, vol. 4, Cent. Dig. §§ 46, 48, 82.

under the age of 18 years, but procured his enlistment by falsely representing to the recruiting officer that he was over 18 years of age. After deserting his ship, he returned home, and was in the custody of his father, who had put him to work, and he was so employed when arrested by the chief of police. The other facts are fully stated in the opinion.

Gordon Macdonald, for petitioner.
W. S. Reese, U. S. Atty.

JONES, District Judge. The statutes (U. S. Comp. St. 1901, pp. 1007, 1008) regarding enlistments in the navy concern three classes of minors: First, those who cannot be enlisted at all; second, those who "shall not be enlisted" without the consent of the parent or guardian; third, those who may, perhaps, enlist of their own volition, regardless of the consent of parent or guardian.

Where minors "who shall not be enlisted" in the army or navy, without the consent of parent or guardian, nevertheless enlist without consent, the inferior courts of the United States and the highest courts of the states, before it was settled they could not interfere on habeas corpus, have accorded variant legal consequences to such enlistments: First, the enlistment is absolutely void, and the minor as well as the parent may so treat it; second, it is void as to the parent or guardian only, and good as to the minor; third, the enlistment is voidable only, and not void, as to the parent or guardian; fourth, notwithstanding the parent's disaffirmance, a military or naval status is impressed upon the minor until the enlistment is annulled by military or civil authority, and leaving the service before discharge, with intention not to return, though with the approval of the parent, constitutes the offense of desertion, for which the minor may be detained from the parent, and punished, though otherwise entitled to discharge.

For nearly a century this conflict of opinion among judges of eminence and courts of the highest authority has vexed our jurisprudence. The Supreme Court has decided that the enlistment of a minor, when the statute permits him to serve with the consent of the parent, is good as to the minor, although enlisted without the parent's consent, and that the parent alone can assail the enlistment. It has not determined whether the enlistment is void, or merely voidable, as against the nonassenting parent; and, if voidable merely, whether, when avoided, it is to be treated as void from its inception.

The maintenance of the authority of the parental relation is of infinite concern to society. Government did not create the relation, for it existed in a state of nature. The law merely recognizes the relation, and regulates its reciprocal rights and duties. The general government has no jurisdiction to interfere with the domestic relation as such. Congress may, however, in the exercise of its power to declare war, raise armies, provide and maintain a navy, displace or subordinate the rights flowing from the parental relation to whatever extent it deems necessary. When Congress legislates under these powers, the parent's existing right, and the state laws protecting and defining it, are displaced or suspended no further than the intention is manifested in the statute. Commonwealth v. Downes, 24 Pick. 230. If, after giving such statutes a fair and reasonable construction in

the light of their purpose, doubt arises as to the effect of prohibitions upon enlistments, made in furtherance of the parental right, that doubt must be resolved in favor of the parent. Silver v. Ladd, 7 Wall. 219, 19 L. Ed. 138; Ex parte Plowman, 53 Ala. 440; Bechtel v. U. S., 101 U. S. 597, 25 L. Ed. 1019; Commonwealth v. Harrison, 11 Mass. 70.

Looking to the law of the state of which the petitioner and his minor child are citizens, we see that the rights of the parent are greatly venerated and valued. The law secures to the parent the right to keep the minor at home, to have the comfort of his society, the aid of his labor, and the duty and pleasure of training him. The will of the parent is made the law for the child, and for all who deal with him. The minor has no power, directly or indirectly, to undermine the right of parental control and custody.

Turning from the state laws to the statutes of the United States, which must control the decision here, we find no intention to displace the rights secured to the parent, under the state law, to the custody and control of any minor under 18 years of age. Congress has followed the policy of the state by declaring that such minors "shall not be enlisted" without the consent of the parent or guardian, and, to make the prohibition more effective, subjects the recruiting officer, the government's representative, to such penalty as a court-martial may inflict for a knowing violation of the law in this regard.

Why does the law authorize enlistments in certain cases, unless it be to create a military or naval status thereby? Why does it forbid enlistments in certain cases, unless it intended no military or naval status should be created thereby? Philpott v. St. George's Hospital, 6 H. L. Cas. 338; 27 L. J. Ch. 72. Congress well knew, if a military status were impressed upon the minor, it would interrupt the parental relation and the rights flowing therefrom. The command is emphatic that certain minors "shall not be enlisted" without the parent's consent. Can it be doubted that the command was given to prevent the minor's acquiring any military status whatever against his parent when he enlisted without the parent's consent? "A thing which is in the intention of the makers of the statute is as much in the statute as if it were in the letter." Eyston v. Studd, 2 Plowden, 465; Holmes v. Carley, 31 N. Y. 290; United States v. Kirby, 7 Wall. 482, 19 L. Ed. 278. Congress deemed such enlistments pernicious and hostile to the public weal, and peremptorily forbade them. The law having impressed that character upon the transaction, it can have no other character in the courts. As said in the United States v. The Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007: "When the lawmaking power speaks upon a particular subject over which it has constitutional power to legislate, public policy in such a case is what the statute enacts." Upon reason and authority, the enlistment here involved is contrary to public policy, and absolutely void as to the father. In re Chapman (C. C.) 37 Fed. 330, 2 L. R. A. 332; Bank of U. S. v. Owens, 2 Pet. 527, 7 L. Ed. 508; Kennett v. Chambers, 14 How. 38, 14 L. Ed. 316; Miller v. Ammon, 145 U. S. 421, 12 Sup. Ct. 884, 36 L. Ed. 759; Birkett v. Chatterton, 13 R. I. 299, 43 Am. Rep. 30. The same consequences

do not result in favor of the minor, because the statute discloses a contrary intent so far as he is concerned. It does not forbid his service as such, or regard it as vicious or improper in itself. The prohibition is imposed solely for the protection of the parent's rights. The minor, in the eye of the statute is not harmed by violation of that right. The minor, therefore, may not invoke the violation of the prohibition; while the parent, for whose benefit the prohibition is imposed, may treat the transaction as absolutely void as to him, and wholly ineffective between him and the government. Brooklyn Life Insurance Company v. Bledsoe, 52 Ala. 551; Spring Company v. Knowlton, 103 U. S. 59, 26 L. Ed. 347.

It is a maxim of the law that no power can be exercised indirectly which cannot be lawfully exercised directly, and whether or not the exercise of the power is lawful must be tested and determined "by its ordinary and natural effect" upon the right against which the exercise of the power is directed. Henderson v. Mayor, 92 U. S. 259, 23 L. Ed. 543; Joseph v. Randolph, 71 Ala. 499, 46 Am. Rep. 347. If the minor by doing a wrongful act as against the father, and the government by doing a further wrong to the father, in attempting to enforce an enlistment made in violation of his wishes, can impress upon the minor, in behalf of the government, as against the father, a status which suspends for any period of time the parent's right to the custody and control of his minor child, it results inevitably that the joint wrong of the minor and the government forfeits, in favor of the government, the wrongdoer, as against the innocent and nonassenting father, rights the statute intended to preserve and safeguard for the father. If this is not doing by indirection what cannot be done directly, it is impossible to present an illustration which would violate the maxim. Magdalen College Case, Coke's Reports, vol. 11, page 66; Wells v. People, 71 Ill. 532.

In the absence of draft or conscription, there can be no military or naval status unless it is voluntarily assumed. There must be legal consent, express or implied. The minor, against the wishes of his parent, is forbidden to consent. The minor cannot volunteer, in the eye of the law, against the father's wishes. The father's will is the only will the minor can have. When this minor entered the navy against the father's will, his service, as against the father, in the legal sense, was just as involuntary and unlawful as if the minor had been kidnapped—taken into the service against his own will. Assuredly, it will not be contended that a minor who has been kidnapped into the navy, in time of peace, thereby acquires a naval status, for a breach of the discipline of which there can arise a right of detention which can defeat the father's paramount right to the custody and control of his child.

When persons enter into a transaction offensive to public policy, the law, with a few exceptions not here material, leaves them where it finds them. So far as it has been executed, the law will not undo it, and, so far as it is executory, the law will not lend its aid to enforce it. No right growing out of any condition resulting from an illegal transaction will be enforced, if to make out that right the party asserting it must lean upon the illegal agreement. How can the govern-

ment show the offense here, unless it can show against the father a valid enlistment? Here the father was not a party to the illegal enlistment, and the law puts the guilty and innocent upon different planes. When an illegal transaction creates a status prejudicial to the rights of an innocent third person, the courts are always swift to set aside the status, and will promptly rip up the transaction from beginning to end, if necessary, to unravel his rights. In what plight do these well-settled principles of law leave the demand of the United States to retain the minor, as against the father, on the claim that the minor still has a subsisting status as an enlisted man, growing out of the forbidden enlistment? When the United States comes into court to assert its rights, it stands as any other suitor, and can no more take advantage of its own wrong than any other party in a court of justice.

In seeking to detain the minor, directly or indirectly, under this enlistment, which the law denounces as to the father, because the father did not consent to it, the government, the party committing the wrong, is seeking the aid of the court to enforce an illegal contract, or a status growing out of it, against an innocent third person, in favor of the government, the wrongdoer. But for the illegal enlistment, the father is clearly entitled to the custody of his child. If the court denies the father the privileges of the writ, it inevitably enforces against the father an enlistment which the statute, on grounds of public policy, made utterly void as to him. No right to the custody of a human being can grow out of an agreement, or a status of service, which is contrary to public policy. Sommersett's Case, 20 Howell's State Trials, pp. 1–79. The privileges of the writ can never be defeated, except by a restraint under a right which the law recognizes and will enforce against the party seeking the writ.

No transaction offensive to public policy can be ratified, or given effect in any way, by any power other than the author of the law, unless the lawmaking power, the creator of the prohibition and the policy, delegates its own dispensing power over them to some other body or agency; and even then the consequences of the prohibition and policy are not withdrawn or subverted until that body or agency does the things required to be done to take the sting of the prohibition out of the forbidden act. The terms and purposes of the statute here necessarily delegate the dispensing power in this matter to the parent. The statute outlaws this enlistment, as to the father, the very moment it is made. The enlistment remains all the while an outlaw as to the father, unless by some affirmative, approving, act he rescues it from the sentence of condemnation which the law pronounces upon it in advance. The statute merely leaves to the parent an election to make· a lawful status from an initial act which, if left alone, the law declares shall be wholly vicious and ineffective. The mere giving of this power of election to the parent does not take the forbidden enlistment out of the domain of malum prohibitum as to the father. So long as he refrains from exercising the power to approve, the law disapproves the enlistment, and keeps in force the sentence of condemnation it had already pronounced. If the parent elects to exercise the right to affirm, the enlistment becomes valid as to him ab initio. If he refrains from exercising his right of election, the forbidden enlistment remains

void as to him ab initio. Here the parent never assented, and the enlistment, therefore, remained all the while, as to him, under the condemnation of the law, and the consequences invariably pronounced upon transactions violative of public policy. There never having been a time here when the enlistment was not a nullity as to the father, there has been no interval of time upon which the government could fasten a right as against the father, and thus build the foundation for impressing a status upon the minor, which would give the government the right to detain him from the custody and control of the parent. The status created by the forbidden enlistment, under the provisions of this statute, is "voidable" as to the father only in the popular sense that an affirmative act of approval may be done by him which, when done, and not until then, will destroy the status inexorably stamped by the law upon the enlistment, in the absence of any intervention by the parent to relieve it. The enlistment is not "voidable" as to the father in the legal sense of the term as ordinarily used, as where some act of the wronged party, and not the force of the law, determines the character of the transaction.

There are many fatal elements of weakness in the government's contention. It construes the statute as though it read: "Enlistments of minors made without the consent of the parent are, nevertheless, valid, to all intents and purposes, until the parent secures a discharge by civil or military authority; which discharge will not be granted if, meanwhile, the minor has not behaved well in the service, upon which the minor is forbidden to enter at all, without consent, until he has been punished." It pushes aside the prohibition, tramples down its purpose, and denies it any power to protect the parental right of custody and control in its full integrity. It repudiates the universally accepted principle of law that an illegal act done by one person without authority, and prejudicial to the rights of an innocent stranger, especially when that act is offensive to public policy, is void from its inception, as between the innocent party and the wrongdoer, after it has been avoided by the person who has the right to treat it as voidable. It subjects the rights the law gives the father to a status which the law forbids the minor to create, and enforces that illegal status created in violation of the father's rights, in favor of one who is forbidden to deal with the minor, so as to destroy the father's rights.

It is evident that the right of the parent, both by state and federal law, exists and remains unimpaired until it has been, in some lawful way, taken from the parent. Where does the government get the right to forfeit the parent's existing right to the custody of the minor, and for what? The parent has committed no offense. No act of his, therefore, has forfeited his right in the child. The minor has committed no offense against the naval laws by enlisting. His enlistment is not an offense punishable under that law. Until the enlistment is complete, the civilian does not become a soldier or sailor. The enlistment, if an offense, is therefore the offense of a civilian. Under our Constitution, he cannot be punished by court-martial, after he becomes a soldier or sailor, for an offense committed by him while a civilian. Moreover, there is no statute which makes this minor amenable to the criminal laws for getting himself enlisted without the parent's consent.

It is said the minor deserted. He cannot be held to be a deserter, as against the parent, unless he had a status, as against the parent, which made it unlawful for the minor to return to the parent, or for the parent to regain possession of the minor and detain him, in repudiation of a status which the law declared he should not acquire as against the parent, unless the parent's consent created that status. Upon what foundation, then, can be rested the right of punishment in the government, as against the father, in the exercise of which it can postpone or destroy the parent's present right to the custody and control of the minor enlisted without the parent's consent? The enlistment statute, giving to it the most narrow construction, intended at least to arm the parent with the right to destroy the naval status of the minor at will. As the existence of that status is a condition precedent to the right of naval custody or control, it follows, upon its destruction, all further right to proceed with any prosecution for naval offenses committed during the existence of the status is taken away as effectually and completely as the repeal of a statute, creating a penal offense, strips a court of the right to proceed further, in the absence of any saving clause in the repealing act.

It is inevitable, then, in order to work out the government's power to suspend the parent's right to the custody of the minor, that the recruit must be treated as a species of offending thing, which, by reason of the use to which it is put, is the lawful subject of prize and capture. True, the father has a species of property in the minor, but the enlistment law was intended to prevent the minor's doing anything, in dealings with naval authorities, which could affect this property right of the parent. Ordinarily, it will not be contended that the use by one person of the property of an innocent owner without his consent, for a purpose not harmful in itself, or forbidden by law—the property not being in itself a nuisance or harmful—and its employment in a transaction to which the owner was neither a party or privy, can forfeit the innocent owner's right to the custody of such property, even temporarily, in favor of a wrongdoer, who makes such unauthorized use of the property without the owner's consent or knowledge. To allow the government to defeat the father's right to the service and custody of the minor amounts to declaring a forfeiture of the father's rights, when that consequence does not, and cannot, result as punishment on conviction for any crime committed by the father, or of any forfeiture declared by law of the father's right to the custody of the minor because the minor unlawfully entered the service, or upon any other foundation than the creation of a status for the minor which the law forbids to be created as against the father. This certainly would not be due process of law. The enlistment statutes are far from clothing the minor who enlists against the parent's wishes with a status, as against the father, of an offending thing, the rights in which can be forfeited by a proceeding in rem, like a ship whose crew, without the knowledge or consent of the owner, undertake piratical aggressions on the high seas, in consequence of which the rights of the owner are forfeited. Even in that case, the forfeiture results only from the offense the ship committed, and the positive provisions of the statute commanding judgment to that effect. In that

instance, however, the owner has trusted his property to those whose acts bring down the forfeiture upon his rights in it.

Only two decisions of the Supreme Court have been cited which shed any direct light on the question. In re Grimley, 137 U. S. 147, 11 Sup. Ct. 54, 34 L. Ed. 636; In re Morrissey, 137 U. S. 157, 11 Sup. Ct. 57, 34 L. Ed. 644. They were decided on the same day, Mr. Justice Brewer delivering the opinion in each. Grimley was over age, and deceived the enlisting officer. There was no statute directly prohibiting the enlistment, or under a penalty, and no "inherent vice" in his service. The statute concerning the enlistment was directory rather than prohibitory. The limitation as to age was for the benefit of the government. No one's rights were involved except Grimley's and those of the government. He was sui juris, and could waive his own rights. His enlistment was irregular only in that he had passed the age limit, and deceived the officer as to that fact. The Supreme Court held he was estopped to take advantage of his own wrong, and the government, the wronged party, had waived its objections. Under these circumstances, the court held that Grimley acquired a valid military status, notwithstanding the limitation as to his age. The court, discussing the statute, asks: "Who can take advantage of Grimley's lack of qualification?" and answers: "Obviously, only the party for whose benefit it was inserted." The party there was the government, and it waived the lack of qualification. Concerning the acquisition of a military status, the court remarked:

"Of course, these considerations do not apply where there is idiocy, insanity, infancy, or any other disability which, in its nature, disables a party from changing his status or entering into new relations; but where the party is sui juris, without any disability to enter into the new relations, the rule generally applies."

Certainly a minor is not sui juris. Certainly under this statute, he is not without "any disability" to "enter into the new relations" as against the father. The government may waive the minor's age, so far as that enters into his qualification. But nothing it can do can create the father's consent. Without that consent, there is an absolute "disability" to "enter into new relations" so as to build up rights in the government as against the father.

In Morrissey's Case, the court again answers the question: "Who can take advantage of the lack of qualification?" Speaking of a statute forbidding the enlistment of minors in the army without the parent's consent, the court said:

"This provision is for the benefit of the parent or guardian. It means simply that the government will not disturb the control of the parent or guardian over his or her child without consent. It gives the right to such parent or guardian to invoke the aid of the court, and secure the restoration of the minor to his or her control; but it gives no privilege to the minor."

Morrissey enlisted under age, and his mother did not consent. She took no steps whatever to assert her rights, and did not sue out the writ of habeas corpus, which was asked by Morrissey himself after he had been convicted of desertion, and was undergoing punishment. The court in that connection, remarked: "His mother not interfering, he was bound to remain in the service, and, the parent not insist-

ing on her rights, the fact that he had a mother living at the time is therefore immaterial." It was not decided in that case that any military status would have remained if the parent had interfered, or that the enlistment, whatever its character as to the minor, does not become void ab initio when the parent interferes. The doctrine in that case is declared in view of the fact that the parent had never interfered. All that the case and the argument in support of it maintains is that the minor, so far as he was concerned, acquired a military status which, as against him, was good until there was interference by one who had a right to his custody and control. There was "inherent vice" in the eye of the law in the service of the minor in this case, as against the father. It was culpable in the eyes of the law, as to him, because it lacked consent. The father's consent to the minor's service is a condition precedent to the enforcement of any naval status against the parent. Without that consent, the minor was of the class forbidden to serve, under the very terms of the law, as emphatically as any other minor who is forbidden to serve, and cannot acquire any military status; for he was debarred, as against the father, from entering into the "new relation." As said in People v. Warden, 100 N. Y. 20, 2 N. E. 870, "This requirement is therefore made the condition of a valid enlistment." The right not to consent is a weapon the law furnishes the parent to destroy the government's claim. It gives the right to take off the uniform, and all its wearing imports. The father here is the wronged party, and the government the wrongdoer. The father can "take advantage of the lack of qualification." As against him, the government could not waive it, or create any right against him by trying to waive it. The language of the opinion, "the mother not interfering, he was bound to remain in the service," inevitably implies, if the parent had interfered, the minor would not be "bound to remain." If he would not be "bound to remain," leaving the service was not desertion. The interference of the father puts an end to the service, as to the father, and destroys the only status which could authorize the naval authority to detain the body of the minor from the custody of the parent.

Finally, it is urged that the privileges of the writ should not be awarded here until the minor has been punished for desertion, because it would militate against the maintenance of discipline in the navy. Winthrop, in his admirable work on Military Law and Precedents, vol. 2, p. 849, speaking of this matter, says:

"In such an instance, the claims of the private individual—the parents—are deemed to be subordinated to the interest of the public in the due administration of justice and maintenance of military discipline, and the minor soldier is therefore required to abide and undergo the legitimate consequences of his own wrong before any petition for his discharge from his contract can be entertained."

Is it only the claim of a private individual which is here involved? Is not the right of every parent to the custody of his minor child, secured and protected by the common law and statutes of the state, and enforced in the statutes of the United States, involved in the rights of the private individual now before the court? The principle involved affects the rights of millions of parents in this land. The matter is

one of the highest public concern, in comparison with which the insignificance of the individual or his inconvenience sinks out of sight. Who determines what is to "the interest of the public"? What are the sources to which we must resort to ascertain what is public policy, and what it requires? Assuredly, only the will of the people, as declared in the law of the land. The enlistment statute declares what is "the interest of the public" in this instance. It is emphatic that the public interest requires that the minor "shall not be enlisted" without the parent's consent.

Awarding the privileges of the writ, if the father has any rights in this matter, is mandatory and compulsory, and not of grace. If the right claimed is well founded, the court, on every consideration of law and justice, must take the law as it finds it, and shut its eyes to the consequences of fearlessly enforcing it. If, however, awarding the privileges of the writ here were discretionary, it would be the bounden duty of the court to give heed to the vital importance of maintaining discipline in the millions of homes in this land, as well as the effect upon discipline in the navy. If the influence and control of fathers and mothers can be successfully set at naught by the government, because of unlawful dealings with their minor children, in the teeth of solemn prohibitions of Congress, a spectacle will be presented to the youth of the country destructive of respect for authority in the home, which is so essential to the formation of character and fitting the youth for future service to the country, whether as civilians or soldiers. "Such a state of things," as said by Chief Justice Shaw in Commonwealth v. Downes, 24 Pick. 230, "would lead to a state of society very much like anarchy." The cultivation of civic virtues, and the discipline of restraint and respect for authority, can nowhere be better taught than around the hearthstone. It is the nursery from which must come the training which fits a free people for self-government, without which their institutions are weak, regardless of the strength of their armies or navies. In view of these considerations, which at every period in the history of our country seem to have controlled the legislation regarding the enlistment of minors, it is difficult to defend the theory, in the teeth of this statute, that, where invasion of the parental right was involved, Congress intended to deny its full enforcement, because of the collateral disturbing consequence that it might, to some extent, affect discipline among enlisted men in the army or navy.

The bad effects upon the army and navy of enforcing the statute in the spirit in which Congress intended, and which are the real grounds of the decisions which maintain a contrary doctrine, are largely overdrawn. It is not infrequently asked, is a minor, circumstanced as this one was, to be permitted to imperil the army or navy by abandoning his colors or deserting the ship in time of battle, or going over to the enemy and betraying the secrets of his commanders, without being amenable to military punishment for such grave offenses? Such crimes cannot be committed in time of peace, when there is no theater of hostilities, no battle, no enemy. In time of war such offenses could and would be punished under the forty-sixth and sixty-third articles of war [U. S. Comp. St. 1901, pp. 952, 957]. One of

these articles provides that "all retainers to the camp and all persons serving in the army of the United States in the field, though not enlisted soldiers, are subject to orders according to the rules and discipline of war." The other subjects to court-martial "whosoever" gives intelligence, etc. It is now the settled construction that under these articles a person in the field with the army, whether in the service in the civil or military capacity, or merely lurking in its lines, can be lawfully tried and punished in time of war for such offenses by military tribunals. There are appropriate articles as to the navy which authorize the punishment by naval tribunals of any one so circumstanced who, in time of war, commits any of the crimes to which reference has been made. If the minor, especially after the parent's dissent, had no status as an enlisted man, under the circumstances governing this case, he was, nevertheless, a civilian, and still amenable to law. The army and navy are often brought into contact with citizens who infringe upon their rights. In time of peace, wrongs committed by civilians must be redressed by the civil courts. The minor, as any other citizen in camp or on a·vessel, in time of peace, is amenable to punishment in the civil courts, both of the state and of the United States, for any wrongs to person or property, if his conduct constitutes a breach of the civil or criminal laws of either.

It is quite true that ordinarily the criminal courts will take a minor from the custody of the parent to punish him for crime. In such cases, the relation of parent and child, or the minority of the offender, if he has reached the age at which he is capable of forming a criminal intent, in no way forms an element of the crime, or the jurisdiction of any court to try him for it. We do not impugn the principle in the least in insisting that here, by reason of infancy and the want of the parent's consent, the minor could not acquire the status against the parent's wishes, which is an indispensable element of the offense of desertion, and the continued existence of which is a condition precedent to the jurisdiction of a naval tribunal to detain and try the minor for it.

The offense of desertion, for which the minor was held in custody by the chief of police, consisted in peaceably leaving the service. True, the minor could not disaffirm the enlistment of his own volition; but he left and came back to the father, who ratified and approved the act of leaving, and made the act as effectually his own as if he had ordered the minor to leave. The minor was back where the law said he belonged. The parent had a right to get the custody and control of the minor, at least peaceably, wherever he found him, and the father had the superior right against any claim growing out of the enlistment, made without the father's consent. Blackstone says it may "frequently happen that a man's wife, children, or servants would be concealed and carried out of his reach, if he have no speedier remedy than the ordinary process of the law. If, therefore, he can so contrive as to gain possession of his property, without force or terror, the law favors and will justify the proceeding." Here, the father's recaption of the minor was complete and peaceful. It was this peaceful and lawful possession by the father which was disturbed when the minor was taken from his custody by the chief of police.

The naval status of the minor is none the less destroyed, in contemplation of law, as against the father, because the government, refusing to recognize the destruction of the status, and insisting upon it, regains the custody of the minor, and thus forces the father to appeal to the civil courts to adjudicate and enforce his rights. Such adjudications do not create the destruction of the enlistment. The law, and if not the law alone, the father's act combined with it, annihilates the status. The judgment of the court merely recognizes and enforces the existing right. If, in this instance, the judgment could be held to create the right, yet, being in furtherance of justice against a wrongdoer, it must relate back to the beginning of the illegal transaction. Surely the government is the wrongdoer when it insists upon the enlistment in spite of the parent's dissent.

The statute under which this writ is issued is peremptory that, within five days after the return of the writ, the court must summarily hear and adjudge the controversy, unless the party petitioning requests a longer time, and thereupon "dispose of the party" as law and justice require. The writ of habeas corpus is the proper proceeding to determine the status of this minor and the present right to his custody. The petitioner and the minor are before the court, and so is the United States. A judgment discharging the prisoner and awarding him to the custody of the father will fix the status of the minor growing out of the enlistment, and estop the government from disputing that status upon any fact existing at the time of the hearing. Freeman on Judgments, 324; U. S. v. Chung Shee (D. C.) 71 Fed. 277; Weir v. Marley, 99 Mo. 484, 12 S. W. 798, 6 L. R. A. 672; People v. Mercein, 3 Hill, 399, 38 Am. Dec. 644; McConologue's Case, 107 Mass. 170.

The judgment the court feels bound to render is that the enlistment, at least after the father's disaffirmance, is void as to the father ab initio, and that the minor must be discharged from naval control, and his custody awarded to his parent. That judgment will put the prisoner, by operation of law, out of the service as effectually as a formal discharge by the Navy Department, and impress the civilian status upon the minor at this time. If, therefore, it be conceded, under the circumstances of this case, that the minor had a naval status as against the parent, and during its existence committed a naval offense for which he could have been punished by a naval tribunal prior to his discharge from the service, the discharge effected by operation of law, by the judgment in this proceeding, constitutes the minor a mere civilian, whom no military tribunal in time of peace has any authority to try for any offense. Constitution of the United States, 5th and 6th Amendments; Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281; Winthrop's Military Law and Precedents, vol. 1, pp. 144, 145. Holding these views, the court would abdicate its duty if it withheld judgment in order to defeat the father's rights, and leave the minor to the custody of a naval tribunal which now has no jurisdiction to try him.

Again, a court-martial has no authority to pass upon the validity of this enlistment so far as the father is concerned, or to determine whether or not the father is entitled to the custody of this minor. It has no authority to discharge from the service, whatever may be the

facts, except as a penalty on conviction for a naval crime. If it found that the minor had no naval status, it could decline to proceed for want of jurisdiction over him; but it could not go beyond this, and determine who was entitled to his custody. It could not even order his release from custody, which can only be done by the authority which convened the court, or higher authority. Having no jurisdiction over the father or his rights, the father could not resort to court-martial to determine his right to the custody of the minor, and no judgment the naval court could render could enforce or defeat the father's rights. The father has the unquestioned right to try these matters before a civil tribunal, which, having all the parties before it, can conclude and settle his rights in that regard, without forcing him to go, it may be, to a distant place, at some future time, to determine the matter, after the military authorities have dealt with the minor. The assembling of a court-martial cannot put this right of the father in abeyance.

This case differs from Ex parte Miller, 52 C. C. A. 472, 114 Fed. 839, in several material aspects. In Miller's Case, the parent had never regained custody of the minor, and formal charges and specifications had been preferred. The prisoner there was in the custody of the military authorities, and a court-martial had been ordered to try him for desertion and fraudulent enlistment. Here no formal charges with specifications have been preferred. No naval court has been organized for the trial of the prisoner, who was taken from the custody of the father, and detained by the chief of police, under authority of the Secretary of the Navy, to hold him as a deserter. The court, in Miller's Case, evidently attached force to the consideration that the parent in that case had taken "no steps to avoid the enlistment before the soldier's arrest for desertion." In this case it affirmatively appears that the minor disappeared, and was gone for a long time from home, without the parent's knowing his whereabouts, or why he left, and the enlistment was actually discovered only on his return to his father, when the minor was almost immediately arrested by the chief of police, and the father immediately sued out this writ. There are authorities, the soundness of which is disputed by other cases, that a civil court will discharge a prisoner held in civil custody, though at the instance of military authorities, where formal charges and specifications have not been preferred, and a court-martial has not been organized to try him, in cases like this; when the civil court would not interfere, in a like case, if such charges and specifications had been preferred, and the prisoner were held by the military authorities awaiting trial before a court-martial to be convened for that purpose. The Court of Appeals, in Miller's Case, say: "The question to be decided is whether the court-martial has jurisdiction to try the prisoner on the charges preferred against him."

It seems to this court a case is presented in which, to quote the language of the Supreme Court of Pennsylvania in Commonwealth v. Fox, 7 Pa. 339, "We must take the law as we find it, and regard the claim which the law of God, of nature, of the state, and of the United States gives the father to the services of his child." The judgment is

that the prisoner is illegally detained by the chief of police, and should be awarded to the custody and control of his father. Counsel for petitioner may prepare the proper order.

After the foregoing opinion was read, the District Attorney, in open court, made known that on the 12th of February, 1903, since the submission of the case on demurrer, the Secretary of the Navy had preferred formal charges against the minor for desertion and fraudulent enlistment, which have been duly served upon the minor. The parties in open court agreed that the new matter be treated as having been embodied in the return, and the petitioner again interposed his demurrer. As the return is made to the writ, and not to the petition, and by a public officer who has no interest in the ultimate custody, and is not presumed to have any knowledge of the facts which determine it, and the only duty enjoined on him by the statute is "to certify the true cause of the detention," it seems doubtful on principle. though held in some cases, whether, on demurrer to the return, it is to be taken as an admission of the truth of the statements of the petition. As the parties have agreed that the facts set forth in the petition are true, the court has treated the return as an admission on demurrer of the averments of the petition, without inquiring whether that would be the proper ruling in the absence of the agreement. Storti v. Massachusetts, 183 U. S. 138, 22 Sup. Ct. 72, 46 L. Ed. 120.

The military or naval offense which Congress creates under the act of March 3, 1893, c. 212, 27 Stat. 715 [U. S. Comp. St. 1901, p. 1006], consists, not in the evil enlistment, but in the receiving of pay and allowances after so enlisting. Congress was not ignorant of what everybody else knew, that the drawing of subsistence in kind, or commuted, is the immediate and inevitable result of every enlistment, whether the recruit be a minor or sui juris. It also knew that a minor could not ordinarily be enlisted, against the wishes of the parent, unless the minor made false representations, deceiving the recruiting officer, and that an enlistment thus effected would be fraudulent.

The statute under which these charges are made makes no regulation whatever of enlistments.. It does not in any manner affect the matter. It leaves the existing laws absolutely untouched. There is no express repeal of them. By every known rule of construction, then, the act prohibiting the enlistment of minors, and the evils it had in view to suppress, must be considered along with the act of 1893 in determining whether any new or different status was intended to be impressed upon the minor, as against the right of the nonassenting parent, because the minor received pay or allowances after his enlistment.

Taking the two acts together, as we must, it is not possible by any legitimate construction to put Congress in the attitude of having the purpose, in its legislation on these subjects, to forbid the enlistment of minors, and thus prevent their acquiring a naval status which would forfeit the right of the nonassenting parent to their custody, and yet harboring at the same time, if the minor added to filial insubordination in enlisting the offense afterwards of receiving rations, the discordant purpose to impress upon the minor, eo instante, a legal naval

or military status, against the nonassenting parent, to forfeit the parent's otherwise unimpeachable right to the custody and control of the minor, which Congress, by its prohibition, intended to save to the parent. Rodgers v. The United States, 185 U. S. 89, 22 Sup. Ct. 582, 46 L. Ed. 816. Under such a construction, a father arriving at the recruiting station an hour after his disobedient boy had, without his consent, enlisted and drawn rations, could not reclaim the custody of the minor as of right; for in that hour the boy, in that view of the law, has effectually enlisted himself, in the service, upon which he had no right to enter at all against the parent's consent. To construe the law as giving a military status at any time to the minor enlisting without consent, as against the father, would annihilate the purposes and intention of the prohibition. It would convert the act of 1893 into a mere cover for evading the prohibition, and destroying the parent's right to the custody and control of minors, and effectually enlist them, on their own volition, against the wishes of parent or guardian. The law never permits a construction of legislation which authorizes evasions of its policy. Magdalen College Case, Coke's Reports, vol. 11, p. 66; Bank of U. S. v. Owens, 2 Pet. 527, 7 L. Ed. 508. The offense here is the inevitable consequence of the illegal enlistment, and is not a collateral offense, as other breaches of discipline might be. If the enlistment is void, or merely voidable, at the option of the parent, the offense charged, which is the direct and inevitable consequence, may also be avoided. If the offense may be avoided, the right to punish, which is but a consequence of the offense, necessarily falls within the avoidance of the enlistment.

The fair and just interpretation of the statute is that the minor does not, against the father, acquire any better military or naval status, by receiving pay and allowances, than he did by the enlistment made against the parent's consent. The operation of the act of 1893, so far as it has any effect in determining the status of persons receiving pay and allowances, is necessarily confined to cases of enlistment where the recruits are sui juris, or have no parent or guardian, or whose parent or guardians have consented to the enlistment, or participated in the fraud by which it was effected. The order made this morning, awarding the custody of the prisoner to the father, will not, therefore, be disturbed.